# TONY AND SUSAN ALAMO FOUNDATION ET AL. *v.* SECRETARY OF LABOR

No. 83–1935.   Argued March 25, 1985—Decided April 23, 1985

WHITE, J., delivered the opinion for a unanimous Court.

*Roy Gean, Jr.,* argued the cause for petitioners. With him on the briefs was *Roy Gean III.*

*Charles Fried* argued the cause for respondent. With him on the brief were *Solicitor General Lee, Michael W. McConnell, Karen I. Ward, Sandra Lord,* and *Barbara J. Johnson.*[*]

JUSTICE WHITE delivered the opinion of the Court.

The threshold question in this case is whether the minimum wage, overtime, and recordkeeping requirements of the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.,* apply to workers engaged in the com-

---

[*]*Burt Neuborne* and *Charles S. Sims* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

mercial activities of a religious foundation, regardless of whether those workers consider themselves "employees." A secondary question is whether application of the Act in this context violates the Religion Clauses of the First Amendment.

I

The Tony and Susan Alamo Foundation is a nonprofit religious organization incorporated under the laws of California. Among its primary purposes, as stated in its Articles of Incorporation, are to "establish, conduct and maintain an Evangelistic Church; to conduct religious services, to minister to the sick and needy, to care for the fatherless and to rescue the fallen, and generally to do those things needful for the promotion of Christian faith, virtue, and charity."[1] The Foundation does not solicit contributions from the public. It derives its income largely from the operation of a number of commercial businesses, which include service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy.[2] These activities have been supervised by petitioners Tony and Susan Alamo, president and secretary-treasurer of the Foundation, respectively.[3] The businesses are staffed largely by the Foundation's "associates," most of whom were drug addicts, derelicts, or criminals before their conversion and rehabilitation by the Foundation. These workers receive no cash salaries, but the Foundation provides them with food, clothing, shelter, and other benefits.

---

[1] App. to Brief for Petitioners 2.

[2] The District Court found that the Foundation operates 4 businesses in California, 30 businesses in Arkansas, 3 businesses in Tennessee, and a motel in Tempe, Arizona. See 567 F. Supp. 556, 559–561 (WD Ark. 1983). The Foundation also receives income from the donations of its associates. *Id.*, at 562.

[3] Susan Alamo was named as a defendant and as a petitioner in this Court, but died after the suit was filed.

In 1977, the Secretary of Labor filed an action against the Foundation, the Alamos, and Larry La Roche, who was then the Foundation's vice president, alleging violations of the minimum wage, overtime, and recordkeeping provisions of the Fair Labor Standards Act, 29 U. S. C. §§ 206(b), 207(a), 211(c), 215(a)(2), (a)(5), with respect to approximately 300 associates.[4] The United States District Court for the Western District of Arkansas held that the Foundation was an "enterprise" within the meaning of 29 U. S. C. § 203(r), which defines that term as "the related activities performed . . . by any person or persons for a common business purpose." 567 F. Supp. 556 (1983). The District Court found that despite the Foundation's incorporation as a nonprofit religious organization, its businesses were "engaged in ordinary commercial activities in competition with other commercial businesses." *Id.*, at 573.

The District Court further ruled that the associates who worked in these businesses were "employees" of the Alamos and of the Foundation within the meaning of the Act. The associates who had testified at trial had vigorously protested the payment of wages, asserting that they considered themselves volunteers who were working only for religious and evangelical reasons. Nevertheless, the District Court found that the associates were "entirely dependent upon the Foundation for long periods." Although they did not expect compensation in the form of ordinary wages, the District Court found, they did expect the Foundation to provide them "food, shelter, clothing, transportation and medical benefits." *Id.*, at 562. These benefits were simply wages in another form, and under the "economic reality" test of employment, see *Goldberg* v. *Whitaker House Cooperative, Inc.*, 366 U. S. 28,

---

[4] The Secretary also charged petitioners with failing to pay overtime wages to certain "outside" employees. The District Court made findings regarding these claims, all but one of which were upheld by the Court of Appeals. The parties have not sought review of that portion of the judgment.

33 (1961),[5] the associates were employees. The District Court also rejected petitioners' arguments that application of the Act to the Foundation violated the Free Exercise and Establishment Clauses of the First Amendment, and the court found no evidence that the Secretary had engaged in unconstitutional discrimination against petitioners in bringing this suit.[6]

The Court of Appeals for the Eighth Circuit affirmed the District Court's holding as to liability, but vacated and remanded as to the appropriate remedy. 722 F. 2d 397 (1984).[7] The Court of Appeals emphasized that the businesses operated by the Foundation serve the general public, in competition with other entrepreneurs. Under the "economic reality" test, the court held,

> "it would be difficult to conclude that the extensive commercial enterprise operated and controlled by the foundation was nothing but a religious liturgy engaged in bringing good news to a pagan world. By entering the economic arena and trafficking in the marketplace, the foundation has subjected itself to the standards Congress has prescribed for the benefit of employees. The

[5] See also United States v. Silk, 331 U. S. 704, 713 (1947); Rutherford Food Corp. v. McComb, 331 U. S. 722, 729 (1947).

[6] The District Court enjoined petitioners from failing to comply with the Act and ordered that all former associates and others who had worked in the businesses covered by the Act be advised of their eligibility to submit a claim to the Secretary. The Secretary was to submit a proposed finding of back wages due each claimant, "less applicable benefits" that had been provided by the Foundation. 567 F. Supp., at 577. The Secretary appealed the remedial portions of the District Court's order.

[7] See n. 6, supra. The Court of Appeals held that the District Court should have calculated back wages due instead of requiring associates to initiate backpay proceedings. 722 F. 2d, at 404–405. On remand, in an unpublished order, the District Court identified specific associates due back wages and ordered the Secretary to submit a proposed judgment. Following this Court's grant of a writ of certiorari, the District Court "administratively terminate[d]" the action pending this Court's decision. Brief for Respondent 12, n. 8.

requirements of the Fair Labor Standards Act apply to its laborers." *Id.*, at 400.

Like the District Court, the Court of Appeals also rejected petitioners' constitutional claims. We granted certiorari, 469 U. S. 915 (1984), and now affirm.

## II

In order for the Foundation's commercial activities to be subject to the Fair Labor Standards Act, two conditions must be satisfied. First, the Foundation's businesses must constitute an "[e]nterprise engaged in commerce or in the production of goods for commerce." 29 U. S. C. § 203(s).[8] Second, the associates must be "employees" within the meaning of the Act. While the statutory definition is exceedingly broad, see *United States* v. *Rosenwasser*, 323 U. S. 360, 362–363 (1945), it does have its limits. An individual who, "without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit," is outside the sweep of the Act. *Walling* v. *Portland Terminal Co.*, 330 U. S. 148, 152 (1947).[9]

## A

Petitioners contend that the Foundation is not an "enterprise" within the meaning of the Act because its activities are

---

[8] Employment may be covered under the Act pursuant to either "individual" or "enterprise" coverage. Prior to the introduction of enterprise coverage in 1961, the only individuals covered under the Act were those engaged directly in interstate commerce or in the production of goods for interstate commerce. Enterprise coverage substantially broadened the scope of the Act to include any employee of an enterprise engaged in interstate commerce, as defined by the Act. The Secretary did not proceed on the basis that the associates are within the scope of individual coverage.

[9] The Court of Appeals omitted this second step of the inquiry, although it mentioned in passing that the associates expected to receive and were dependent on the in-kind benefits. 722 F. 2d, at 399. The District Court's findings on this question are sufficiently clear, however, that a remand is unnecessary.

not performed for "a common business purpose."[10]  In support of this assertion, petitioners point to the fact that the Internal Revenue Service has certified the Foundation as tax-exempt under 26 U. S. C. § 501(c)(3), which exempts "any . . . foundation . . . organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes."[11]

The Court has consistently construed the Act "liberally to apply to the furthest reaches consistent with congressional direction," *Mitchell* v. *Lublin, McGaughy & Associates*, 358 U. S. 207, 211 (1959), recognizing that broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency. *Powell* v. *United States Cartridge Co.*, 339 U. S. 497, 516 (1950).[12]  The statute contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations,[13]

---

[10] Section 203(r) defines "enterprise" in pertinent part as

"the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor."

Petitioners do not dispute that the Foundation's various activities are performed "through . . . common control." Nor do they quarrel with the District Court's finding that the Foundation's annual gross volume of sales exceeds $250,000, as required by § 203(s)(1).  See 567 F. Supp., at 561.

[11] The Internal Revenue Service has apparently not determined whether petitioners' commercial activities are "unrelated business" subject to taxation under 26 U. S. C. §§ 511–513.  See App. to Brief for Petitioners 14; Tr. of Oral Arg. 30.

[12] See also *Goldberg* v. *Whitaker House Cooperative, Inc.*, 366 U. S. 28 (1961); *Rutherford Food Corp.* v. *McComb*, 331 U. S. 722 (1947); *United States* v. *Rosenwasser*, 323 U. S. 360 (1945).

[13] Cf. *Powell* v. *United States Cartridge Co.*, 339 U. S., at 517 (exemptions from the Act are "narrow and specific," implying that "employees not thus exempted . . . remain within the Act").

and the agency charged with its enforcement has consistently interpreted the statute to reach such businesses. The Labor Department's regulation defining "business purpose," which is entitled to considerable weight in construing the Act, explicitly states:

> "Activities of eleemosynary, religious, or educational organization *[sic]* may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities, such as operating a printing and publishing plant, the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise." 29 CFR § 779.214 (1984).

See also *Marshall* v. *Woods Hole Oceanographic Institution*, 458 F. Supp. 709 (Mass. 1978); *Marshall* v. *Elks Club of Huntington, Inc.*, 444 F. Supp. 957, 967–968 (SD W. Va. 1977). Cf. *Mitchell* v. *Pilgrim Holiness Church Corp.*, 210 F. 2d 879 (CA7), cert. denied, 347 U. S. 1013 (1954).

The legislative history of the Act supports this administrative and judicial gloss. When the Act was broadened in 1961 to cover "enterprises" as well as individuals, the Senate Committee Report indicated that the activities of nonprofit groups were excluded from coverage only insofar as they were not performed for a "business purpose." [14] Some illumination of congressional intent is provided by the debate on a proposed floor amendment that would have specifically excluded from the definition of "employer," see 29 U. S. C. § 203(d), organizations qualifying for tax exemption under 26

---

[14] The Senate Committee Report, in discussing the "common business purpose" requirement, states:

"[T]he definition would not include eleemosynary, religious, or educational organizations not operated for profit. The key word in the definition which supports this conclusion is the word 'business.' Activities of organizations of the type referred to, if they are not operated for profit, are not activities performed for a 'business' purpose." S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960).

U. S. C. § 501(c)(3).[15] The floor manager of the bill opposed the amendment because it might have been interpreted to "g[o] beyond the language of the [Committee] report" by excluding a "profitmaking corporation or company" owned by "an eleemosynary institution."[16] The proponent of the failed amendment countered that it would not have excluded "a church which has a business operation on the side."[17] There was thus broad congressional consensus that ordinary commercial businesses should not be exempted from the Act simply because they happened to be owned by religious or other nonprofit organizations.[18]

Petitioners further contend that the various businesses they operate differ from "ordinary" commercial businesses because they are infused with a religious purpose. The businesses minister to the needs of the associates, they contend, both by providing rehabilitation and by providing them with food, clothing, and shelter. In addition, petitioners argue, the businesses function as "churches in disguise"—vehicles

---

[15] 106 Cong. Rec. 16704 (1960).

[16] *Ibid.* (remarks of Sen. Kennedy).

[17] *Id.,* at 16703 (remarks of Sen. Goldwater). The following year, when the expansion of the Fair Labor Standards Act was again considered and this time enacted, Senator Curtis proposed the same amendment that Senator Goldwater had unsuccessfully introduced. The amendment was once more rejected. Senator McNamara, Chairman of the Senate Education and Labor Committee, opposed the amendment on the ground that it would remove from the protection of the Act employees of nonprofit organizations who were engaged in "activities which compete with private industry to such a degree that the competition would have a very adverse effect on private industry. . . . [W]hen such industry comes into competition in the marketplace with private industry, we say that their work is not charitable organization work." 107 Cong. Rec. 6255 (1961). See also H. R. Rep. No. 75, 87th Cong., 1st Sess., 8 (1961); S. Rep. No. 145, 87th Cong., 1st Sess., 41 (1961).

[18] Because we perceive no "significant risk" of an infringement on First Amendment rights, see *infra,* at 303–306, we do not require any clearer expression of congressional intent to regulate these activities. See *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 500 (1979).

for preaching and spreading the gospel to the public. See Brief for Petitioners 27–28. The characterization of petitioners' businesses, however, is a factual question resolved against petitioners by both courts below, and therefore barred from review in this Court "absent the most exceptional circumstances."[19] The lower courts clearly took account of the religious aspects of the Foundation's endeavors, and were correct in scrutinizing the activities at issue by reference to objectively ascertainable facts concerning their nature and scope. Both courts found that the Foundation's businesses serve the general public in competition with ordinary commercial enterprises, see 722 F. 2d, at 400; 567 F. Supp., at 573, and the payment of substandard wages would undoubtedly give petitioners and similar organizations an advantage over their competitors. It is exactly this kind of "unfair method of competition" that the Act was intended to prevent, see 29 U. S. C. § 202(a)(3), and the admixture of religious motivations does not alter a business' effect on commerce.

### B

That the Foundation's commercial activities are within the Act's definition of "enterprise" does not, as we have noted, end the inquiry. An individual may work for a covered enterprise and nevertheless not be an "employee." In *Walling* v. *Portland Terminal Co.*, 330 U. S. 148 (1947), the Court held that individuals being trained as railroad yard brakemen—individuals who unquestionably worked in "the kind of activities covered by the Act"[20]—were not "employees." The trainees enrolled in a course lasting approximately seven or eight days, during which time they did some actual work

---

[19] *Branti* v. *Finkel*, 445 U. S. 507, 512, n. 6 (1980).

[20] 330 U. S., at 150. Since *Walling* was decided before the advent of "enterprise coverage," see n. 8, *supra*, the Court's remark must have been premised on the fact that railroad brakemen work directly in interstate commerce.

under close supervision. If, after completion of the training period, the trainees obtained permanent employment with the railroad, they received a retroactive allowance of four dollars for each day of the course. Otherwise, however, they neither received or expected any remuneration. *Id.*, at 150. The Court held that, despite the comprehensive nature of the Act's definitions,[21] they were "obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." The trainees were in much the same position as students in a school. Considering that the trainees' employment did not "contemplate . . . compensation," and accepting the findings that the railroads received "'no immediate advantage' from any work done by the trainees," the Court ruled that the trainees did not fall within the definition of "employee." *Id.*, at 153.

Relying on the affidavits and testimony of numerous associates, petitioners contend that the individuals who worked in the Foundation's businesses, like the trainees in *Portland Terminal,* expected no compensation for their labors. It is true that the District Court found that the Secretary had "failed to produce any past or present associate of the Foundation who viewed his work in the Foundation's various commercial businesses as anything other than 'volunteering' his services to the Foundation." 567 F. Supp., at 562. An associate characterized by the District Court as typical "testified convincingly that she considered her work in the Foundation's businesses as part of her ministry," and that she did not work for material rewards. *Ibid.* This same

---

[21] The Act defines "employ" as including "to suffer or permit to work" and "employee" as (with certain exceptions not relevant here) "any individual employed by an employer." 29 U. S. C. §§ 203(g), (e). See *Rutherford Food Corp.*, 331 U. S., at 728; *Rosenwasser*, 323 U. S., at 362–363, and n. 3 (quoting Sen. Black as stating that the term "employee" had been given "the broadest definition that has ever been included in any one act," 81 Cong. Rec. 7657 (1935)).

associate also testified that "no one ever expected any kind of compensation, and the thought is totally vexing to my soul." App. 79.

Nevertheless, these protestations, however sincere, cannot be dispositive. The test of employment under the Act is one of "economic reality," see *Goldberg* v. *Whitaker House Cooperative, Inc.*, 366 U. S., at 33, and the situation here is a far cry from that in *Portland Terminal.* Whereas in *Portland Terminal*, the training course lasted a little over a week, in this case the associates were "entirely dependent upon the Foundation for long periods, in some cases several years." 567 F. Supp., at 562. Under the circumstances, the District Court's finding that the associates must have expected to receive in-kind benefits—and expected them in exchange for their services—is certainly not clearly erroneous.[22] Under *Portland Terminal*, a compensation agreement may be "implied" as well as "express," 330 U. S., at 152, and the fact that the compensation was received primarily in the form of benefits rather than cash is in this context immaterial. These benefits are, as the District Court stated, wages in another form.[23]

---

[22] Former associates called by the Secretary as witnesses testified that they had been "fined" heavily for poor job performance, worked on a "commission" basis, and were prohibited from obtaining food from the cafeteria if they were absent from work—even if the absence was due to illness or inclement weather. App. 148–149, 146, 153, 218–219. These former associates also testified that they sometimes worked as long as 10 to 15 hours per day, 6 or 7 days per week. This testimony was contradicted in part by petitoners' witnesses, who were current associates. See 567 F. Supp., at 562. Even their testimony, however, was somewhat ambiguous. Ann Elmore, for example, testified that the thought of receiving compensation was "vexing to [her] soul." But in the same paragraph, in answer to a question as to whether she expected the benefits, she stated that "the benefits are just a matter of—of course, we went out and we worked for them." App. 78–79.

[23] The Act defines "wage" as including board, food, lodging, and similar benefits customarily furnished by the employer to the employees. As the

That the associates themselves vehemently protest coverage under the Act makes this case unusual,[24] but the purposes of the Act require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work "voluntarily," employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act. Cf. *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728 (1981); *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S. 697 (1945). Such exceptions to coverage would affect many more people than those workers directly at issue in this case and would be likely to exert a general downward pressure on wages in competing businesses. As was observed in *Gemsco, Inc.* v. *Walling*, 324 U. S. 244, 252–254 (1945), it was there essential to uphold the Wage and Hour Administrator's authority to ban industrial homework in the embroideries industry, because "if the prohibition cannot be made, the floor for the entire industry falls and the right of the homeworkers and the employers to be free from the prohibition destroys the right of the much larger number of factory workers to receive the minimum wage."

Nor is there any reason to fear that, as petitioners assert, coverage of the Foundation's business activities will lead to coverage of volunteers who drive the elderly to church, serve church suppers, or help remodel a church home for the needy. See Brief for Petitioners 24–25. The Act reaches only the "ordinary commercial activities" of religious organizations, 29 CFR § 779.214 (1984), and only those who engage in those activities in expectation of compensation.

---

District Court recognized, an employer is entitled to credit for the reasonable cost of these benefits. 567 F. Supp., at 563, 577; see 29 U. S. C. § 203(m).

[24] Cf. *Van Schaick* v. *Church of Scientology*, 535 F. Supp. 1125 (Mass. 1982); *Turner* v. *Unification Church*, 473 F. Supp. 367 (RI 1978), aff'd, 602 F. 2d 458 (CA1 1979) (FLSA claims brought by former church members).

Ordinary volunteerism is not threatened by this interpretation of the statute.[25]

## III

Petitioners further contend that application of the Act infringes on rights protected by the Religion Clauses of the First Amendment. Specifically, they argue that imposition of the minimum wage and recordkeeping requirements will violate the rights of the associates to freely exercise their religion[26] and the right of the Foundation to be free of excessive government entanglement in its affairs. Neither of these contentions has merit.

It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights. See, *e. g.*, *United States* v. *Lee*, 455 U. S. 252, 256–257 (1982); *Thomas* v. *Review Board, Indiana Employment Security Div.*, 450 U. S. 707, 717–718 (1981). Petitioners claim that the receipt of "wages" would violate the religious convictions of the associates.[27] The Act, however, does not require

---

[25] The Solicitor General states that in determining whether individuals have truly volunteered their services, the Department of Labor considers a variety of factors, including the receipt of any benefits from those for whom the services are performed, whether the activity is a less than full-time occupation, and whether the services are of the kind typically associated with volunteer work. The Department has recognized as volunteer services those of individuals who help to minister to the comfort of the sick, elderly, indigent, infirm, or handicapped, and those who work with retarded or disadvantaged youth. See Brief for Respondent 4–5, and n. 3.

[26] Petitioner Larry La Roche is an associate and a former vice-president of the Foundation. The Foundation also has standing to raise the free exercise claims of the associates, who are members of the religious organization as well as employees under the Act. See *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 458–459 (1958). But cf. *Donovan* v. *Shenandoah Baptist Church*, 573 F. Supp. 320, 325–326 (WD Va. 1983).

[27] Petitioners point to the following testimony by two associates deemed representative by the District Court:

the payment of cash wages. Section 203(m) defines "wage" to include "the reasonable cost . . . of furnishing [an] employee with board, lodging, or other facilities." See n. 23, *supra*. Since the associates currently receive such benefits in exchange for working in the Foundation's businesses, application of the Act will work little or no change in their situation: the associates may simply continue to be paid in the form of benefits. The religious objection does not appear to be to receiving any specified *amount* of wages. Indeed, petitioners and the associates assert that the associates' standard of living far exceeds the minimum.[28] Even if the Foundation were to pay wages in cash, or if the associates' beliefs precluded them from accepting the statutory amount, there is nothing in the Act to prevent the associates from returning the amounts to the Foundation, provided that they do so voluntarily.[29] We therefore fail to perceive how application of the Act would interfere with the associates' right to

---

"And no one ever expected any kind of compensation, and the thought is totally vexing to my soul. It would defeat my whole purpose." App. 79 (testimony of Ann Elmore).

"I believe it would be offensive to me to even be considered to be forced to take a wage. . . . I believe it offends my right to worship God as I choose." *Id.*, at 62–63 (testimony of Bill Levy).

Petitioners also argue that the recordkeeping requirements of the Act, 29 U. S. C. § 211, will burden the exercise of the associates' religious beliefs. This claim rests on a misreading of the Act. Section 211 imposes recordkeeping requirements on the employer, not on the employees.

[28] See App. 62, 89 (testimony of Bill Levy and Edward Mick); Brief for Petitioners 33. The actual value of the benefits provided to associates— a matter of heated dispute below—was determined by the District Court to average somewhat over $200 a month per associate. 567 F. Supp., at 566–570.

[29] Counsel for petitioners stated at oral argument that the associates would either fail to claim the backpay that was due them or simply return it to the Foundation. Tr. of Oral Arg. 25, 46. Counsel argued that this fact undermined the Secretary's argument that he had a "compelling interest" in applying the Act, but it is also indicative of how slight a change application of the Act would effect in the current state of affairs.

freely exercise their religious beliefs.    Cf. *United States* v. *Lee, supra,* at 257.

Petitioners also argue that application of the Act's record-keeping requirements would have the "primary effect" of inhibiting religious activity and would foster "'an excessive government entanglement with religion,'" thereby violating the Establishment Clause.    See *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613 (1971) (quoting *Walz* v. *Tax Comm'n,* 397 U. S. 664, 674 (1970)).[30]    The Act merely requires a covered employer to keep records "of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him."    29 U. S. C. § 211(c). Employers must also preserve these records and "make such reports therefrom from time to time to the Administrator as he shall prescribe."    *Ibid.*    These requirements apply only to commercial activities undertaken with a "business purpose," and would therefore have no impact on petitioners' own evangelical activities or on individuals engaged in volunteer work for other religious organizations.    And the routine and factual inquiries required by § 211(c) bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion.[31]    The Establishment Clause does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations, see *Lemon, supra,* at 614, and the recordkeeping requirements of the Fair Labor Standards Act, while

---

[30] Under the *Lemon* test, the criteria to be used in determining whether a statute violates the Establishment Clause are whether the statute has a secular legislative purpose; whether its primary effect is one that neither advances nor inhibits religion; and whether it fosters excessive government entanglement with religion.    403 U. S., at 612–613.    No one here contends that the Fair Labor Standards Act has anything other than secular purposes.

[31] See *Meek* v. *Pittenger,* 421 U. S. 349 (1975); *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971).    Cf. *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490 (1979).

perhaps more burdensome in terms of paperwork, are not significantly more intrusive into religious affairs.[32]

## IV

The Foundation's commercial activities, undertaken with a "common business purpose," are not beyond the reach of the Fair Labor Standards Act because of the Foundation's religious character, and its associates are "employees" within the meaning of the Act because they work in contemplation of compensation. Like other employees covered by the Act, the associates are entitled to its full protection. Furthermore, application of the Act to the Foundation's commercial activities is fully consistent with the requirements of the First Amendment. The judgment below is accordingly

*Affirmed.*

---

[32] Petitioners also argue that application of the Act to them denies them equal protection of the laws because the Foundation's treatment of its associates is no different from the Government's treatment of its own volunteer workers, such as those enrolled in the ACTION program. The respondent aptly characterizes this claim as "frivolous." Brief for Respondent 46. The activities of federal volunteers are directly supervised by the Government, unlike the activities of those alleged to be volunteering their services to private entities. Furthermore, work in Government volunteer programs is "limited to activities which would not otherwise be performed by employed workers and which will not supplant the hiring of or result in the displacement of employed workers." 42 U. S. C. § 5044(a). Thus, Congress could rationally have concluded that minimum wage coverage of such volunteers is required neither for the protection of the volunteers themselves nor for the prevention of unfair competition with private employers. Petitioners have identified no reason to scrutinize the Government's classification under any stricter standard. The District Court found no evidence that the Department was acting on the basis of hostility to petitioners' religious beliefs. 567 F. Supp., at 574.