*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

MICHIGAN OCCUPATIONAL SAFETY AND
HEALTH ADMINISTRATION,

        Appellant,

v

YODER FAMILY FARM,

        Appellee

FOR PUBLICATION
August 25, 2022
9:15 a.m.

No. 355262
Ingham Circuit Court
LC No. 19-000950-AA

Before: GLEICHER, C.J., and SAWYER and GARRETT, JJ.

GLEICHER, C.J.

Alvin Yoder was fatally electrocuted while refilling a grain bin at the Yoder Family Farm. The Michigan Occupational Safety and Health Administration (MIOSHA) inspected the Farm and cited it for several safety violations. The Farm claims that MIOSHA lacked jurisdiction to issue the citations because Alvin was not a Farm employee. An administrative law judge and the circuit court agreed.

The Yoder Family Farm is a commercial enterprise. The adult Yoder children who work on the farm, including Alvin, are compensated for their work with food, clothing, and shelter, rather than ordinary wages. Under the economic reality test, a fact question exists regarding Alvin's employment status. We reverse the circuit court and remand to the Michigan Board of Health and Safety Compliance and Appeals for further proceedings consistent with this opinion.

## I. BACKGROUND

Alvin's tragic death occurred in August 2017, while he was working on the Yoder Family Farm, an organic dairy farm that produces milk sold for income. The Yoder parents and their children (both adults and minors) supply the labor for the enterprise. At the time of the accident, Alvin was removing a metal pole from a grain bin. He intended to use the pole to scrape grain from the sides of the bin and was electrocuted when the metal pole contacted an overhead wire.

After the accident, a MIOSHA safety officer inspected the Farm and issued four citations for administrative safety rule violations. The citations alleged that: Alvin was an "unqualified

person" working within 10 feet of an unguarded, energized overhead power line (Mich Admin Code, R 408.14005(4))[1], Alvin was an untrained employee who had been exposed to a risk of electrical shock (Mich Admin Code, R 408.14002(2))[2], Alvin had not been trained in safety-related work practices related to his job assignments (Mich Admin Code, R 408.14002(3)), and no "fall protection" had been offered to employees working on top of the grain bin (Mich Admin Code, R 408.13390).[3] MIOSHA levied a $16,100 fine against the Farm.

The Farm contested MIOSHA's ability to issue the citations, asserting that because Alvin was not an employee and the Farm had no employees, MIOSHA lacked jurisdiction. The dispute made its way to the administrative hearing system, where the parties stipulated to these relevant facts:

> 18. John and Eva May Yoder and their family operate a family dairy farm. Family members perform the tasks necessary to carry out the operations on the farm.

> 19. The Yoder family members who performed tasks on the family farm at the time of the accident were John Yoder (Owner), Eva May Yoder (Spouse), Rhoda Kay Yoder (daughter, age 21), Alvin Yoder[] (son, age 19), Regina Yoder[] (daughter, age 18), Leon Yoder (twin—son, age 15), Leroy Yoder (twin—son age 15), Joni Yoder (daughter, age 13), and Rose Ella Yoder (daughter, age 10).

> 20. Family members are not paid for the tasks they perform on the farm. Family members receive a roof over their head, food on the table, clothes on their back, and the love and support of their family.

> 21. Mr. John Yoder was aware that Alvin was involved in the task of refilling the grain bin at the time of the accident.

> 22. The Yoder Family Farm is not a business entity registered with the State of Michigan or the County of Clare, Michigan. John Yoder owns the farm. The Yoder Family Farm does not have an Employer Identification Number. Mr. and Mrs. Yoder file tax returns jointly as a married couple.

In the administrative tribunal, the Farm argued that this Court's decision in *Hottmann v Hottmann*, 226 Mich App 171; 572 NW2d 259 (1997), governs whether a person is an employee under the Michigan Occupational Safety Act (the act), MCL 408.1001 *et seq*., and that *Hottmann* held that employee status requires "payment of compensation." The Farm additionally contended

---

[1] This rule was rescinded in 2019.

[2] This rule was also rescinded in 2019.

[3] This rule was rescinded in 2018.

that the application of MIOSHA safety rules violated the Yoders' religious freedom under the Free Exercise Clauses of the Michigan and United States Constitutions.[4]

Relying on *Hottmann*, the administrative law judge (ALJ) dismissed the citations, ruling that "the *Hottman* holding applies to the determination of the existence of an employer-employee relationship under" the act and that *Hottmann* stands for the proposition that the payment of compensation is an "essential element of the employer-employee relationship." Alvin was akin to a student or a volunteer on the farm, the ALJ found, and not an employee. The ALJ did not address the constitutional issues but concluded that MIOSHA lacks the authority to inspect small farms with fewer than 10 employees, not counting family members, even if MIOSHA used only state funds for its investigation.

MIOSHA's circuit court appeal met the same fate. The judge found *Hottmann* controlling and affirmed the ALJ's finding that MIOSHA had no authority to inspect a small farm such as the Yoders'. We granted MIOSHA's application for leave to appeal.

## II.  ANALYSIS

### A.  *HOTTMANN* AND THE ECONOMIC REALITY TEST

The ALJ and the circuit court erred by relying on *Hottmann*, a premises liability case that did not examine the issue presented in this case: whether a farm worker who is compensated with food, clothing, and shelter is an employee under an occupational safety act. In deciding whether Alvin was an employee as that term is used in the act, we adopt the economic reality test, "the most common tool for discerning whether an employer-employee relationship exists." *Buckley v Prof Plaza Clinic Corp*, 281 Mich App 224, 234; 761 NW2d 284 (2008).

Our review of an agency's final decision is limited to examining whether it is "contrary to law, is not arbitrary, capricious, or a clear abuse of discretion, and is supported by competent, material and substantial evidence on the whole record." *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 583; 701 NW2d 214 (2005). Similarly, we consider a circuit court's review of an administrative decision only to determine whether the circuit court applied correct legal principles and the substantial evidence test was met. *Id*. at 585. But our interpretation and application of statutory provisions is de novo, without deference to the two judges who have considered this case. *United Parcel Serv, Inc v Bureau of Safety & Regulation*, 277 Mich App 192, 202; 745 NW2d 125 (2007).

The act is remedial in nature and should be liberally construed to accomplish its "broad objective . . . to provide all employees with a work site free from recognized hazards." *Barker Bros Constr v Bureau of Safety & Regulation*, 212 Mich App 132, 139; 536 NW2d 845 (1995). Section 9 of the act declares, "The safety, health, and general welfare of employees are primary public concerns. The legislature hereby declares that all employees shall be provided safe and healthful work environments free of recognized hazards." MCL 408.1009. The act applies "to all

---

[4] The constitutional issues are not presented in this appeal, so we do not address them.

places of employment in the state, except in domestic employment and in mines . . . ."  MCL 408.1002(1).[5]

The act defines a "place of employment" as "a factory, plant, establishment, construction site or other similar area, workplace, or environment where an employee is permitted to work."  MCL 408.1006(1).  MCL 408.1005(1) defines an "employee" as "a person permitted to work by an employer."  MCL 408.1005(2) defines an employer, in pertinent part, as "an individual or organization . . . that employs 1 or more persons."  As noted by this Court in *Barker Bros*, 212 Mich App at 137, "business size is irrelevant as long as there is at least one employee."

The Yoder Family Farm is a commercial business in competition with other dairy farms.  Although the statutory definitions of the terms "employer" and "employee" are somewhat circular, we have no difficulty concluding that the adult workers on the Farm, including Alvin, were compensated for their work with material things: food, clothing, and shelter.  They were not volunteers providing service to the Farm for pleasure and without expectation of a return on the investment of their labor.  On this record, there was a quid pro quo exchange for Alvin's labor— work for food and other life necessities.  Whether this compensation rendered Alvin an "employee" as contemplated by the act requires further analysis under the economic reality test, a task we entrust to the factfinder.  We reject, however, that *Hottman* provides any legal guidance on this issue.

In considering *Hottmann*'s applicability, we must first review basic principles governing precedent.  MCR 7.215(J)(1) instructs that "a panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals" issued after 1990.  Therefore, we must examine the rule of law established in *Hottmann*.  A "rule of law" is a "substantive legal principle," according to *Black's Law Dictionary* (11th ed).  The rule of law typically justifies the holding in a case, which is "a court's determination of a matter of law pivotal to its decision."  *Freed v Thomas*, 976 F3d 729, 738 (CA 6, 2020) (cleaned up).  In contrast, our Supreme Court has described "dicta" as "[s]tatements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand" that "lack the force of an adjudication."  *Wold Architects & Engineers v Strat*, 474 Mich 223, 232 n 3; 713 NW2d 750 (2006) (quotation marks and citations omitted).  In other words, dicta is not necessary to the determination of the rule of law announced in an opinion.

Our review of *Hottmann* reveals that the "rule of law" announced in that decision does not govern the legal issue presented in this case.

Randall Hottmann, the plaintiff, agreed to help his brother and sister-in-law, defendants Richard and Deborah Hottman, put a new roof on their home and garage.  Randall "was not paid for his services and did not expect anything in return for his assistance."  *Hottmann*, 226 Mich App at 173.  While working on the roof, Randall fell and broke his arm.  Invoking a premises liability theory, he sued the defendants alleging that they breached their duty to maintain the

---

[5] " 'Domestic employment' means that employment involving an employee specifically employed by a householder to engage in work or an activity relating to the operation of a household and its surroundings, whether or not the employee resides in the household."  MCL 408.1004(7).

-4-

premises in a reasonably safe condition, and that they had allowed him to work on the roof in violation of the occupational safety act. The trial court granted summary disposition in favor of the defendants, ruling that the danger of falling off a roof was open and obvious and that the act did not apply because Randall was not the defendants' employee. *Id*. at 174.

This Court held that the trial court erred by summarily dismissing Randall's premises liability claim. The majority then turned to the question of whether "the trial court erred in ruling that the provisions of the [act] were not admissible." *Id*. at 177. The act applies to "employers" who employ one or more persons, the Court pointed out, citing MCL 408.1005(1). *Hottmann*, 226 Mich App at 178. Because the word "employ" is not defined in the statute, this Court supplied a definition drawn from *Black's Law Dictionary* and "the common and approved usage of the word." *Id*. The word "employ" is "link[ed] . . . with the payment of compensation to the employee," the Court continued, explaining:

> [S]uch an interpretation is consistent with the Legislature's purpose in enacting the [act]. The [act] was designed to ensure that employers in business, industry, and government keep their employees' work sites free of recognized hazards. See MCL 408.1009. *Nothing in the language of the [act] suggests that it should be applied to homeowners' do-it-yourself projects, nor is it reasonable to expect the average homeowner engaging in such a project to be familiar with and comply with [occupational safety] regulations. [Id*. at 178-179 (emphasis added).]

The *Hottmann* plaintiffs attempted to prove the applicability of regulations promulgated under the act through the affidavit of a regional supervisor for the Department of Labor. The witness averred that under the act, "there is no requirement that a person be paid wages or receive other compensation in order to be considered an employee." *Id*. at 179. This Court rejected that the affidavit changed the outcome, observing that "the duty to interpret and apply the law has been allocated to the courts, not to the parties' expert witnesses." *Id*. The Court concluded:

> We therefore find that the trial court did not abuse its discretion in ruling that the [regulations promulgated under the act] are inadmissible in any trial of this case. The issue for the trier of fact is whether defendant violated the standard of conduct of a reasonable person, not whether defendant failed to comply with the [act]. [*Id*. at 180 (citation omitted).]

The relevant "rule of law" announced in *Hottmann* is that the act does not apply to "homeowners' do-it-yourself projects" because those engaged in such projects are not "employees." Although this Court also expressed that the word "employ" is "link[ed] . . . with payment of compensation to the employee," this is not the holding of the case. And even if it were construed as the rule of law announced in *Hottmann*, our holding today is consistent with this principle.

The undisputed evidence before the ALJ was that Alvin Yoder received food, clothing, and shelter in exchange for his work. In the parties' stipulated parlance, Alvin "receive[d] a roof over [his] head, food on the table, [and] clothes on [his] back." These benefits of employment were compensation for work he performed—wages in another form. In contrast, Randall Hottmann received no compensation in any form for working on his brother's roof and expected none.

*Hottmann* did not address the situation presented here—work performed in exchange for food, clothing, and shelter. Alvin's work on the Yoder Family Farm, a profit-making enterprise, is not equivalent to a "homeowners' do-it-yourself project." *Hottman* does not govern the determination of whether an employer-employee relationship existed on the Yoder Family Farm.

Nor does dicta in *Hottmann* conflict with our holding today. The *Hottmann* majority pointed out that the word "employ" is defined in *Black's Law Dictionary* (6th ed), as " 'to hire,' " which in turn is defined as " 'to arrange for the labor or services of another for a stipulated compensation.' " *Hottman*, 226 Mich App at 178. The Farm's arrangement with Alvin was consistent with this obiter dictum definition.

Because our disagreement with the lower tribunals regarding the applicability of *Hottmann* does not resolve the case, we must look elsewhere for guidance. In many other remedial legislation contexts in which the question of "employment" is at issue, this Court and our Supreme Court have analyzed the question under the economic reality (or realities) test. See *Kidder v Miller-Davis Co*, 455 Mich 25; 564 NW2d 872 (1997) (applying the economic realities test to distinguish between employees and independent contractors for purposes of the Worker's Disability Compensation Act, MCL 418.101 *et seq*.); *Duckworth v Cherokee Ins Co*, 333 Mich App 202; 963 NW2d 610 (2020) (using the economic realities test to decide whether a trucker was an employee or independent contractor for purposes of MCL 500.3114(3) of the no-fault act); *Buckley v Prof Plaza Clinic Corp*, 281 Mich App 224; 761 NW2d 284 (2008) (using the economic realities test to determine whether a physician was an employee or independent contractor for purposes of the payment of wages and fringe benefits act, MCL 408.471 *et seq*.); *Ashker v Ford Motor Co*, 245 Mich App 9; 627 NW2d 1 (2001) (noting that the economic realities test is used in the context of remedial social legislation, and applying that test with respect to a claim brought under the Civil Rights Act, MCL 37.2101 *et seq*.).[6]

The United States Supreme Court applied one version of an "economic reality test" when analyzing the question of employment under the federal Fair Labor Standards Act, 29 USC 201 *et seq*., in a case bearing marked similarities to this one and is helpful by way of analogy. The petitioner in *Tony & Susan Alamo Foundation v Secretary of Labor*, 471 US 290, 292; 105 S Ct 1953; 85 L Ed 2d 278 (1985), was a nonprofit religious organization that derived its income from the operation of several commercial businesses, including retail clothing and grocery outlets. The businesses were staffed by "associates" who did not receive cash salaries but were instead provided with "food, clothing, shelter, and other benefits." *Id*. The Supreme Court affirmed the lower courts' rulings that these benefits were equivalent to wages. "[A] compensation agreement may be 'implied' as well as 'express,'" the Court expounded, "and the fact that the compensation was received primarily in the form of benefits rather than cash is in this context immaterial." *Id*. at

---

[6] The federal courts have also relied on the "economic realities test" in determining whether an entity is an employer for the purposes of the federal OSHA. See, e.g., *Loomis Cabinet Co v Occupational Safety & Health Review Comm*, 20 F3d 938 (CA 9, 1994).

301. "The test of employment under the Act is one of 'economic reality,' " the Supreme Court explained.[7] *Id.*

The economic reality test described in other Michigan cases confronts the question of whether an employer-employee relationship exists, and we conclude that it is appropriate to apply it under the act now before us. As recognized in the cases in which it has been employed, the economic reality test offers a useful framework for analyzing the question presented, particularly because the test incorporates considerations compelling examination of individual circumstances.

On remand, we direct the Board of Health and Safety Compliance and Appeals to apply the economic reality test to the totality of the circumstances surrounding Alvin's work on the Farm, including the following factors set forth in *Buckley*, 281 Mich App at 235: "(1) the control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." (Cleaned up.) These factors are not exclusive, and the board may consider others it finds appropriate and consistent with the economic reality framework.

As discussed earlier in this opinion, "wages" are but one form of compensation for work. According to *Black's Law Dictionary* (11th ed), the word "wage[s]" encompasses "every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer." Thus, the "payment of wages" under the economic reality test is not limited to an exchange of money for work. The board is directed to consider any express and implied agreements for compensation, and that the term "wages" may include the provision of benefits other than money. The factors presented here are not exhaustive, none is dispositive, and the board may consider others. "However, weight should be given to those factors that most favorably effectuate the objectives of the statute in question." *Buckley*, 281 Mich App at 235 (cleaned up).

Our dissenting colleague takes issue with our interpretation of *Hottmann*, urging that the "familial relationship" here, like the parties' relationship in *Hottmann*, is not "transactional" and therefore within *Hottmann*'s precedential reach. Our decision to remand for consideration of Alvin's employment status under the economic reality test, the dissent laments, will lead to the

---

[7] Although the Court did not spell out the elements of the "economic reality test" mentioned in *Alamo Foundation*, other Supreme Court caselaw references a common-law analysis of "employment" similar to Michigan's test. In *Nationwide Mut Ins Co v Darden*, 503 US 318, 323; 112 S Ct 1344; 117 L Ed 2d 581 (1992), the Supreme Court adopted "a common-law test for determining who qualifies as an 'employee' under" the Employment Retirement Income Security Act, 29 USC 1001 *et seq*. The factors listed in the opinion are akin to those applied by Michigan courts. The Supreme Court noted that the federal courts generally employ this common-law test to determine employment status unless the statute at issue defines the term "employee" more specifically or expansively. *Id*. at 325-326. See also *Clackamas Gastroenterology Assoc, PC v Wells*, 538 US 440, 444; 123 S Ct 1673; 155 L Ed 2d 615 (2003) (noting that where a statute does not "helpfully define" the term "employee," we construe "similar language to give us guidance on how best to fill the gap in the statutory text").

end of family farms.  We cannot agree that requiring even a small family-owned and operated farm to abide by MIOSHA requirements is the death-knell for that form of enterprise.  The dissent cites no evidence in support of this paean, and we are not aware of any.  More importantly, whether "family farms" should be entirely exempt from the act is a decision for the Legislature, not a court. Congress has exempted from federal OSHA regulation farming operations that employ "10 or fewer employees."  United States Department of Labor, Occupational Safety and Health Administration, Appropriations Act: Replacement of Appendix A for CPL 02-00-051, March 9, 2022, available at <https://www.osha.gov/enforcement/directives/cpl-02-00-051#ENFOR> (accessed August 15, 2022).  However, according to a policy clarification issued by the Department of Labor, "if an employer performs activities on a small farm that are not related to farming operations and are not necessary to gain economic value from products produced on the farm," OSHA may enforce its regulations.  United States Department of Labor, Occupational Safety and Health Administration, Policy Clarification on OSHA'S Enforcement Authority at Small Farms, July 29, 2014, available at <https://www.osha.gov/memos/2014-07-29/policy-clarification-oshas-enforcement-authority-small-farms> (accessed August 15, 2022).  For example, "food processing operations" are not exempt, "even if they take place on a small farm." *Id*.  Michigan's Legislature has not limited the act's application other than as stated above, exempting "domestic employment" and mines.  And whether the Yoder's farm qualifies as a workplace subject to MIOSHA requirements is yet to be determined,[8] based on the legal guidelines provided in this opinion rather than *Hottmann*, a tort case that does not address the issues presented here, or emotional appeals.[9]

---

[8] Our dissenting colleague erroneously asserts that the "logical conclusion" of our decision will be MIOSHA investigations of children who are injured doing chores around the house.  This slippery-slope conclusion is anything but logical.  MIOSHA's jurisdiction applies to nearly all workplaces in Michigan, and of course, work on an income-producing family farm bears no resemblance to a child taking out the trash.

[9] We must also respectfully disagree with the dissent's argument that protecting workers on small family farms is a form of "interference" with a family that should not fall within the "outside world's" interest.  "Agriculture is one of the most dangerous industries in the United States and in the entire world."  Haas, *What's Really Happening Down on the Farm: Guidance For Resolving Employee Negligence Suits Against Small Farm Owners*, 44 S Ill ULJ 143, 144 (2019).  Contrary to the dissent, others have advocated for greater protections of farmworkers on small, family-owned farms.  See Guild & Figueroa, *The Neighbors Who Feed Us: Farmworkers and Government Policy-Challenges and Solutions*, 13 Harv L & Pol'y Rev 157, 180 (2018) ("OSHA should end its policy of excluding agricultural employers and their workers from occupational safety standards for general industry and should provide farmworkers with safeguards that are at least equivalent to those provided in other occupations.").  Our Legislature has opted to include small farms within the act's purview.

## B. MIOSHA'S INSPECTION OF SMALL FARMS

The circuit court additionally ruled that MIOSHA cannot inspect small farms even when it uses only state funds to do so. No state or federal laws or regulations preclude MIOSHA from carrying out such inspections using state funds, and we reverse the circuit court's contrary ruling.

As MIOSHA admits in its brief on appeal, the federal government prohibits states from using federal funds to enforce OSHA regulations on small farms. See OSHA Instruction, Directive No. CPL 2-0.51J(X)(A) (exempting farming operations employing 10 or fewer employees).[10] But the directive does not prohibit states from engaging in OSHA activities with nonfederal funds. The record supports that was the case here.

A MIOSHA instruction labeled MIOSHA-ADM-06-7R6 (February 25, 2021)[11] states that only state funds may be used for "interventions" at farming operations that would be classified as small farms under the federal guidance. The instruction explains:

> In providing funding for OSHA and hence the MIOSHA program, the U.S. Congress has placed restrictions on use of federal funds for program activities regarding two categories of employers: small farming operations and small employers in low-hazard industries. This is solely a restriction on expending federal funds it does not prohibit state funded MIOSHA activities at these worksites. . . . MIOSHA has put in place a process to use state funds for activities that cannot be paid for with federal funds. [MIOSHA-ADM-06-7R6, § X.]

The Farm has never alleged that MIOSHA used federal funds in connection with the inspection at issue here.

The ALJ relied on MCL 24.232(8) and (9) to conclude that MIOSHA is nonetheless prohibited from inspecting a small farm, regardless of the funding source for the inspection. MCL 24.232 states, in part:

> (8) Except for an emergency rule promulgated under [MCL 24.248], and subject to subsection (10), *if the federal government has mandated that this state promulgate rules, an agency shall not adopt or promulgate a rule more stringent than the applicable federally mandated standard unless the director of the agency determines that there is a clear and convincing need to exceed the applicable federal standard.*

> (9) Except for an emergency rule promulgated under [MCL 24.348], and subject to subsection (10), *if the federal government has not mandated that this*

---

[10] This directive is available at <https://www.osha.gov/enforcement/directives/cpl-02-00-051> (accessed July 20, 2022).

[11] This instruction is available at <https://adms.apps.lara.state.mi.us/File/ViewDmsDocument/13260> (accessed July 20, 2022).

*state promulgate rules, an agency shall not adopt or promulgate a rule more stringent than an applicable federal standard unless specifically authorized by a statute of this state or unless the director of the agency determines that there is a clear and convincing need to exceed the applicable federal standard.* [Emphasis added.][12]

The circuit court relied, in part, on MCL 408.1014(6). This statute states:

> Beginning April 1, 1992, *a proposed administrative rule that would address a matter not addressed by 1 or more federal standards shall not be processed and presented to the joint committee on administrative rules unless the director determines that there is a clear and convincing need for the standard to meet the criteria set forth*, as appropriate, in [MCL 408.1009, 408.1016, 408.1019, and 408.1024]. The director shall include a statement of the specific facts that establish the clear and convincing need when processing and presenting the administrative rule. The statement shall either explain the unique characteristics of industry in this state that necessitate the standard or demonstrate that the standard was requested by a broad consensus of union and nonunion employers and employees in the specific industry affected by the standard. [Emphasis added.]

These statutes are inapplicable here because they address promulgated *rules* or proposed promulgated *rules*, and MIOSHA's rules are not at issue; the lower courts' rulings involve MIOSHA's *enforcement* of its rules. MIOSHA's decision to use state funds to inspect small farms is not a safety standard or an administrative rule, but a policy choice. And no state law restricts MIOSHA's ability to make this choice, and to inspect small farms providing that the farms satisfy other jurisdictional prerequisites.

### III. CONCLUSION

We sympathize with the Yoders' loss of their son. The regulations promulgated and enforced by MIOSHA are designed to prevent such tragedies. Whether those regulations apply to the Yoder Family Farm must be determined on remand using the economic reality test and the guidelines discussed in this opinion. We reverse and remand to the board for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett

---

[12] MCL 24.232(10) referenced in these subsections applies only to special education programs and services rules. We further note that MCL 24.232(8) and (9) did not take effect until January 1, 2019. See 2018 PA 602. This was after the initial citations against Yoder Family Farm, but before the ALJ's decision.