D. Rick **KARTEVOLD**; Audrey Abrahamson; William R. Carl; Thomas L. Hedequist; Joseph F. Greene; Lyle E. Hattenburg; Daniel J. Kern; Gary J. Mauri; Jack L. Moon; Charles L. Oliver; James H. Panknin; Janice M. Panknin; James R. Richards; Michael D. Van Heel; and Kevin J. Von Steuben, Plaintiffs,

v.

**SPOKANE COUNTY FIRE PROTECTION DISTRICT NO. 9, Defendant.**

No. C–85–391.

United States District Court, E.D. Washington.

Jan. 21, 1986.

---

Steven B. Frank, Frank and Rosen, Seattle, Wash., for plaintiffs.

Richard J. Schroeder, Dellwo, Rudolf & Schroeder, Spokane, Wash., for defendant.

### ORDER

ROBERT J. McNICHOLS, Chief Judge.

This action was commenced on May 23, 1985 by fifteen employees of Spokane County Fire Protection District No. 9 pursuant to the private enforcement provisions of the Fair Labor Standards Act [FLSA], 29 U.S.C. § 216. Plaintiffs seek an award for unpaid overtime and for liquidated damages in an amount equal to such back pay. Currently pending are cross-motions for summary judgment on the issue of liability only.

### I. Background

The essential facts are straight-forward and not in dispute. Over the span of years, the fire district entered into collective bargaining agreements from time to time with its employees through their union. The provisions of the CBA giving rise to this litigation contemplated that fire fighters would work "24 on/48 off." That is, employees would serve a single shift of 24 continuous hours, and then take two full days off. The practical import of this arrangement was that over the course of a typical three-week period, a fireman would serve seven complete days, or 168 hours, and yet would receive no overtime. Facially, the failure to pay overtime would appear to contravene the 1974 amendments to the FLSA.

Shortly after the effective date of the amendments, however, the Supreme Court decided *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) which addressed FLSA minimum wage and overtime provisions in precisely the same context as presented by the facts at bar. Noting first that the Commerce Clause vested plenary power in Congress over matters affecting interstate commerce, the Court nonetheless held that the Reserved Powers Doctrine embodied in the Tenth Amendment precluded use of that ostensibly plenary authority when an attempt is made to regulate "States *qua* States," acting in their sovereign capacity, "in areas of traditional governmental functions." *Id.* at 851–52, 96 S.Ct. at 2474. Finding this test fully satisfied where Con-

gress invades a local government's prerogatives in such traditional local concerns as public safety, the Court held the minimum pay and overtime provisions of the FLSA unconstitutional as applied to States and their political subdivisions. *Id.* at 852, 96 S.Ct. at 2474.

On February 19, 1985 the Court readdressed the core teaching of *National League of Cities* in *Garcia v. San Antonio Metro. Transit Authority,* — U.S. —, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Holding the "traditional governmental function" prong of the test enunciated in *National League of Cities* "unsound in principle and unworkable in practice," the Court expressly overruled its earlier position, and found the subject FLSA provisions wholly consonant with precepts of federalism. 105 S.Ct. at 1016.

Plaintiffs concede that the CBA currently in place complies with FLSA requirements and seek damages only prior to its effective date of April 15, 1985. Adding yet another layer of complexity is Congress' response to *Garcia.* P.L. 99–150, the Fair Labor Standards Amendments of 1985, became law on November 13, 1985. Section 2(c) of that enactment relieves employers such as defendant in the instant action from liability incurred for failure to abide by the 1974 amendments if such violation occurred before April 15, 1986. However, the effective date of this section is not until April 15, 1986. With this quagmire in place, we commence our inquiry.

The parties are in agreement on several issues. First, by operation of *Garcia,* the fire district no longer enjoys immunity from FLSA overtime provisions. Second, the longstanding common law rule is that a decision reformulating federal civil law will usually be applied retroactively, subject to certain delineated exceptions. *See generally,* Orland & Stebing, *Retroactivity in Review: The Federal and Washington Approaches,* 16 Gonz.L.Rev. 855, 855–72 (1981). Third, the determinative test for viewing issues relating to retroactive versus prospective application is found in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Beyond such limited agreement on general principles, the parties sharply dispute each other's contentions regarding retroactive application of *Garcia.*

## II. Retroactivity of *Garcia* in light of *Chevron*

*Chevron* enunciated a three prong test, the satisfaction of which would militate in favor of prospectivity:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed, ... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." .... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355 (citations omitted).

## A. Efficacy of *National League of Cities* pre-*Garcia:*

Plaintiffs argue that the rule emanating from *National League of Cities,* which exempted States and their subdivisions from the minimum pay and overtime requirements of the FLSA when acting in their sovereign capacities, had been undergoing a steady and foreseeable erosion pre-*Garcia.* In particular, plaintiffs point to *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), which dissolved such exemption insofar as the Age Discrimination in Employment Act [ADEA] was concerned. It is argued that *Garcia* is merely a logical extension of *EEOC,* or at least, that the ultimate result of *Garcia*

was readily foreseeable. There are a number of reasons why this Court cannot agree.

First, as plaintiffs concede, the "clearly foreshadowed" language of *Chevron* applies by its own terms only to cases of first impression. Whatever else might be said of *National League of Cities* and its sequelae, it can hardly be claimed that *Garcia* was a matter of first impression. Thus, the relevant inquiry is whether *Garcia* represented a break from "clear past precedent."

Interestingly, there has been only one change in the complement of the Supreme Court since *National League of Cities* was decided some ten years ago, and that was when Justice O'Connor was appointed to fill the vacancy left by Justice Stewart. With respect to issues presented by *Garcia* and *National League of Cities*, both 5–4 decisions, these two Justices appear to be of the same mind. Thus, it is an easy task to discern the basis underlying the Court's 180–degree turn. Justice Blackmun was the swing vote. Concurring in *National League of Cities*, he switched sides entirely in *Garcia*. Indeed, he wrote the opinion. As observed by defendant, perhaps a scholar of the Court could have analyzed Justice Blackmun's writings over the course of the intervening decade and predicted the outcome in *Garcia*. To attribute such powers of prognostication to the average citizen, or even to the typical lawyer for that matter, is another question entirely.

The focus, then, must be on the teachings of the Court as expressed in its written decisions during the intervening period. Plaintiffs' reliance on decisions such as *EEOC* is not well-placed. Ignoring Justice Stevens' clarion call to overrule *National League of Cities*, as expressed in his concurrence, the majority (which had been the minority in *National League of Cities*), was content to treat the earlier case as controlling, and to merely distinguish *EEOC* on the grounds that bringing the States under the umbrella of the ADEA would not " 'directly impair' the State's ability. to 'structure integral operations in

areas of traditional governmental functions.' " 460 U.S. at 239, 103 S.Ct. at 1062. Indeed, the Court went further by commenting that its ruling would not prevent employment decisions predicated upon age, but only that the States would hereafter be constrained by the objective criteria set forth in the ADEA. *Id.* at 239–40, 103 S.Ct. at 1062–63.

Finally, we come to *Garcia*. If there was any feeling among observers of the Court that *National League of Cities* had been vitiated by intervening decisions, it was lost on the lawyers who argued the *Garcia* case. The Court itself had to solicit an attack upon the continuing vitality of *National League of Cities*, —— U.S. ——, 104 S.Ct. 3582, 82 L.Ed.2d 880 (1984). After supplemental argument, the majority discarded the "traditional governmental functions" prong of the *National League of Cities* test by holding such inquiry to be both "unsound" and "unworkable." 105 S.Ct. at 1016. Any doubt that *Garcia* represented a drastic turn-about is dispelled by Justice Powell's dissenting opinion:

> The Court today, in its 5–4 decision, overrules *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), a case in which we held that Congress lacked authority to impose the requirements of the Fair Labor Standards Act on state and local governments. Because I believe this decision substantially alters the federal system embodied in the Constitution, I dissent.

### I.

There are, of course, numerous examples over the history of this Court in which prior decisions have been reconsidered and overruled. There have been few cases, however, in which the principle of *stare decisis* and the rationale of recent decisions were ignored as abruptly as we now witness. The reasoning of the Court in *National League of Cities*, and the principle applied there, have been reiterated consistently over the past eight years. Since its decision in 1976,

*National League of Cities* has been cited and quoted in opinions joined by every member of the present Court.

105 S.Ct. at 1021 (footnote and citations omitted).

There is little room for arguing the proposition that *National League of Cities* met with less than unanimity in legal circles. To begin with, the majority's opinion was dependent for its vitality upon Justice Blackmun's somewhat reluctant concurrence in which he sought to impose an additional element in the form of a balancing test which would require a comparative analysis of federal and state interests. 426 U.S. at 856, 96 S.Ct. at 2476. Nor were the dissenters particularly gentle, characterizing the decision as "ill-conceived," "devoid of meaningful content," and "mischievous." *Id.* at 867, 873 & 880, 96 S.Ct. at 2481, 2484 & 2487 (Brennan, J., dissenting). Strident cries of revisionism reverberated throughout the halls of academia. See *EEOC v. Wyoming,* 514 F.Supp. 595, 598 (D.Wyo.1981), *rev'd,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) and authorities cited therein. The decision was bombarded with frontal attacks in subsequent opinions. *See, e.g., EEOC, supra,* 460 U.S. at 250, 103 S.Ct. at 1068 (Stevens, J., concurring) (*National League of Cities* is a "modern embodiment of the spirit of the Articles of Confederation.").

For all of this manifest hostility, however, there is one truism which must control the instant inquiry. *National League of Cities* was the law. It was "clear precedent" within the meaning of *Chevron, supra,* from the date of announcement forward until struck down in *Garcia.* As noted by Justice Powell in his dissent in *Garcia, National League of Cities* had on occasion been distinguished and narrowed, but "there was no hint ... that *National League of Cities* —or its basic standard— was subject to the infirmities discovered today." 105 S.Ct. at 1022.

Of necessity, the topic of *National League of Cities'* continuing vitality pre-*Garcia* will bear further discussion in relation to the third prong of *Chevron; viz.,*

equitable considerations. For purposes of viewing the first prong, however, the Court concludes that *Garcia* "establish[ed] a new principle of law ... by overruling clear past precedent on which litigants may have relied." *Chevron, supra,* 404 U.S. at 106, 92 S.Ct. at 355.

**B. Promotion of the Rule of Law:**

The second *Chevron* prong directs the Court to look to "the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 404 U.S. at 107, 92 S.Ct. at 355. There is no need to speculate on legislative intent in framing the 1938 Act. Congress spelled out its concerns in express language in 29 U.S.C. § 202. The courts have consistently recognized the benevolent motive of Congress to upgrade both conditions in the work place and the worker's standard of living. *See, e.g., Brennan v. Wilson Bldg., Inc.,* 478 F.2d 1090, 1094 (5th Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 156, 38 L.Ed.2d 105 (1973) and authorities cited therein. The rule remains today that the FLSA should be read broadly to accomplish its remedial objectives. *See, e.g., Tony & Susan Alamo Foundation v. Sec. of Labor,* —— U.S. ——, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985). However, no single prong of the *Chevron* test is dispositive. See *People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1426-27 (9th Cir.1985); *Barina v. Gulf Trading and Transp. Co.,* 726 F.2d 560, 563-64 (9th Cir.1984). Thus, while the second *Chevron* criterion favors plaintiffs' position, it would be premature to end the inquiry at this juncture.

**C. Equitable Considerations:**

*Chevron* requires an examination into the practicalities of retroactivity by asking whether "substantial inequitable results" or "injustice" or "hardship" would be occasioned thereby. 404 U.S. at 107, 92 S.Ct. at 355. The precise economic impact of *Garcia* on the fire district cannot be ascer-

tained on the current state of the record.[1] Plaintiffs point to several sources of taxing authority conferred under state law which arguably would allow funds to be raised to pay for any judgment which might result. Defendant has countered that assertion by representing that: (1) the district is already drawing the maximum percentage of tax-base allowable under the general levy procedure; (2) the reserve fund reflected in the budget is not surplus money, but merely the carry-over from one budget year to the next which will be required to finance operations until the ensuing year's taxes have been collected; and (3) any excess levy over the percentage provided for under the general levy procedure would ultimately require a favorable vote of the electorate.[2]

Resolution of who has the better position would necessitate a detailed inquiry into the intricacies of the interplay among the various state statutes cited (most of which have yet to be construed by Washington courts), and would likely require an evidentiary hearing as well. Such an endeavor is unnecessary. Within the context of the question before the Court, merely framing the problem serves to illustrate the financial imponderables visited upon local government by *Garcia*.[3] Aside from any issue over quantification of the fire district's resources, there is a more basic rea-

son why applying *Garcia* retrospectively would be inherently unfair not only to the litigants at bar, but to the entire system.

Implicit in the first *Chevron* prong is the notion that case law affords a foundation for day-to-day decision-making which is worthy of reliance. It is a rare transaction entered into by anyone in which the parties do not have in mind certain expectations which society would deem wholly warranted. Seldom if ever does the typical citizen consciously reflect on the source of such expectations, but there is no disputing the fact that in any jurisdiction grounded on common law development of legal principles, the source, either directly or indirectly, is to be found in judicial construction. The Supreme Court has recognized that the doctrine of *stare decisis* is not simply a mechanical tool employed by the judiciary to cut its work load. Rather:

> We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations.

*Helvering v. Hallock*, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940).

That policy is disserved when thousands of public officials across the country, such as the fire district commissioners in the instant case, proceed in good faith to dis-

---

**1.** *Hodel v. Virginia Surface Mining & Recl. Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) has been cited for the proposition that the fire district's ability to pay is irrelevant. It is true that *Hodel* suggests that economic consequences to a state, standing alone, will not bar congressional action properly predicated upon its Commerce Clause powers. *Id.* at 292 n. 33, 101 S.Ct. at 2368 n. 33. But the now-defunct Tenth Amendment analysis engaged in by *Hodel* presents substantially different issues than does the retroactivity question at hand. The Supreme Court has had occasion to consider whether the potential for significant financial impact on local government constitutes good cause for nonretroactive application of its own decision, and has answered in the affirmative. *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969).

**2.** The Court's reading of RCW ch. 52.16 does not comport entirely with the interpretation posited by defendant. It is not at all clear that the fire

district lacks authority to issue general obligation bonds and thereafter impose an excess levy without first securing voter approval. In order to save counsel from arguing non-issues on appeal, it should be emphasized that the Court has in no sense reached the merits of either party's contention regarding the fire district's resources.

**3.** The Court has no occasion to consider the national economic impact of *Garcia*. That is a matter left to Congress. See Section III *infra*. Insofar as the parties to the instant action are concerned, it bears noting that the award sought is $108,000 in back pay, $108,000 in liquidated damages, and statutory costs and attorney fees. If a rural fire district with only a handful of employees and largely dependent for its manpower on volunteers can incur that kind of liability, one cannot help but wonder what the final cost of applying *Garcia* retroactively would be across the Nation.

charge their duty by entering into contractual agreements with their employees and on behalf of their constituency in reasonable reliance upon longstanding precedent, only to have their efforts declared retrospectively unlawful. It is unfair to the public officials, to their taxpayers, and to the system at large.

When a trial court assumes the task of deciding what is equitable and what is not in areas so broad and so impactive on the public interest as present here, there is a concurrent assumption of the risk that its conclusion will be deemed nothing more than *ipse dixit.* Thus, there is some solace to be gained in the observation that Congress has already weighed the equities at stake and determined as a matter of national policy that the harm to local governments caused by immediate compliance with *Garcia* outweighs any interest public employees may have in immediate access to FLSA benefits. See Section III *infra.*

#### D. Summary:

It bears noting that *Garcia* did not involve a minor point of fine-tuning the law. On the contrary, the decision raised and decided issues which go to the conceptual heart of defining the nature of government. *Garcia* has been characterized in briefing as "just another skirmish" in a see-sawing battle which has raged since the founding days of the Nation. No doubt this is true, for as the members of the dissent in *Garcia* openly declare, they will reinstate *National League of Cities* at the earliest opportunity. 105 S.Ct. at 1033 (Rehnquist, J., dissenting). It is precisely because of the fundamental nature and tulmultuous quality of this ongoing tug-of-war with basic constitutional values that the Court feels obliged to place heavy emphasis on the first prong of *Chevron,* and to consider the sharp break represented by *Garcia* as impactive on the third prong as well.

Finally, plaintiffs argue that even if *Garcia* is prospective only, they are entitled to an award from February 19, 1985, the date of decision, until April 15, 1985 when the current CBA became effective. The fire district contends that the relevant date is not the time the decision was announced, but at the termination of appellate proceedings on April 15, 1985 when rehearing was denied. —— U.S. ——, 105 S.Ct. 2041. No authority has been cited for either proposition. *Cf.,* Rules 52.2 & 52.3, *Rules of the Supreme Court of the United States.* Even assuming the technical accuracy of defendant's construction, however, one might question whether the termination date of appellate proceedings is necessarily controlling in weighing issues pertaining to retroactivity. After all, announcement of *Garcia* could not help but reduce a litigant's reliance on *National League of Cities.* Were it necessary to resolve this issue, further briefing would likely be indicated. In light of the alternative basis for disposition of the instant motions presented below, the matter need not be reached.

### III. Fair Labor Standards Amendments of 1985

For all of the impressive effort demonstrated by counsel in pursuing and opposing the instant motions, scant attention has been extended P.L. 99–150, *reprinted in, U.S.Code Cong. & Ad.News,* 99 Stat. 787 (1985). Section 2(c) thereof provides that:

> No State, political subdivision of a State, or interstate governmental agency shall be liable under section 16 of the Fair Labor Standards Act of 1938 for a violation of ... such Act occurring before April 15, 1986, with respect to any employee ... who would not have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985.

At the same time, however, section 2(c) of P.L. 99–150 does not become effective until April 15, 1986. *Id.* at § 6. The parties are aware of this development. Indeed, the enactment of these amendments is what prompted plaintiffs to request expedited proceedings on the theory that if this action can be reduced to judgment prior to April 15, 1986, then applicability of section 2(c) will be a moot question.

It is well-settled that the best evidence of legislative intent is the express language chosen by Congress in framing its enactments. *See, e.g., Moorhead v. United States*, 774 F.2d 936, 940–41 (9th Cir.1985); *Powell v. Tucson Air Museum Foundation of Pima County*, 771 F.2d 1309, 1311 (9th Cir.1985). On the other hand, where literal application of a statute would obtain an untoward result, and available legislative history clearly indicates that congressional intent would not be served by such literal reading, the courts have been quick to give effect to the intent, as opposed to the bare language. *See, e.g., Moorhead, supra*, 774 F.2d at 940–41; *In re Cecchini*, 772 F.2d 1493, 1495 (9th Cir.1985). In so doing, a court should be mindful of the particular facts and circumstances surrounding a given enactment. *Lewis v. Hegstrom*, 767 F.2d 1371, 1376 (9th Cir.1985).

With the foregoing ground rules in place, can it be said that Congress intended to create a "window" during which litigation such as the instant action could be maintained, but that the window would be slammed shut as of April 15, 1986? Legislative history is hardly supportive of any such position. The committee reports accompanying P.L. 99–150 are thoughtfully considered and expansively analyzed, perhaps extraordinarily so. The Senate Report, for example, noted the need for the amendments as follows:

> In seeking to guarantee a minimum standard of living for all working Americans, the FLSA has been heralded as one of our most fundamental efforts to direct economic forces into socially desirable channels. By 1974, FLSA coverage extended to three-fourths of the nation's employed nonsupervisor labor force; federal, state and local government employees were the only major exceptions. Federal workers now have been protected for more than a decade, but most state and local government employees only became covered as of the Supreme Court's *Garcia* decision in February 1985. The Committee is not retreating

> from the principles established by Congress in the 1966 and 1974 FLSA amendments. The rights and protections accorded to employees of the federal government and the private sector also are extended to employees of states and their political subdivisions.

> At the same time, it is essential that the particular needs and circumstances of the States and their political subdivisions be carefully weighed and fairly accommodated. As the Supreme Court stated in *Garcia*, "the States occupy a special position in our constitutional system." Under that system, Congress has the responsibility to ensure that federal legislation does not undermine the States' "special position" or "unduly burden the States." In reporting this bill, the Committee seeks to discharge that responsibility and to further the principles of cooperative federalism.

> In particular, in the wake of *Garcia*, the States and their political subdivisions have identified several respects in which they would be injured by immediate application of the FLSA. This legislation responds to these concerns by adjusting certain FLSA principles with respect to employees of states and their political subdivisions and by deferring the effective date of certain provisions of the FLSA insofar as they apply to the States and their political subdivisions.

> The Committee recognizes that the financial costs of coming into compliance with the FLSA—*particularly the overtime provisions of section 7*—are a matter of grave concern to many states and localities. We have received extensive testimony on this subject from representatives of state and local governments and organized labor. Although the testimony reflects sharp disagreements as to the nature and context of FLSA compliance costs, the Committee concludes that states and localities required to comply with the FLSA will be forced to assume additional financial responsibilities which

in at least some instances could be substantial.

Jurisdictions which had relied for a decade upon the exemptions accorded under *National League of Cities* would be required to meet FLSA standards immediately under *Garcia.* Although many jurisdictions commendably and successfully have undertaken to do so, others have expressed an urgent need for leadtime in which to reorder their budgetary priorities while maintaining fiscal stability. *As the Committee did under its 1974 amendments, it has again allowed for lead-time for state and local governments to comply with the FLSA requirements.*

*S.Rep. No.* 99–159 at 7–8, *reprinted in, U.S.Code Cong. & Ad.News* 651, 655–56 (1985) (emphasis added).

Delving further into the Report reveals the following:

State and local government employers who are engaged in traditional functions as described by DOL at 29 CFR 775.2 and 775.4 (schools, hospitals, fire prevention, police protection, sanitation, public health, parks and recreation, libraries, museums) are therefore exempt from FLSA overtime liability until April 15, 1986. The Committee has deferred application of the FLSA overtime provisions until exactly one year after the mandate in *Garcia* so that state and local governments may make necessary adjustments in their work practices, staffing patterns, and fiscal priorities.

*Id.* at 15, *reprinted in, U.S.Code Cong. & Ad.News* 663 (1985).

Going beyond the general statements of policy contained in the Senate Report is the more explicit House Conference Report. After first noting with approval that some employers affected by *Garcia* commenced paying overtime rates after February 19, 1985, the Report states categorically that:

State and local government employers are in no way obligated to comply with *the Act's* overtime provisions prior to April 15, 1986.

*House Conf.Rep. No.* 99–357 at 8, *reprinted in, U.S.Code Cong. & Ad.News* 670 (1985) (emphasis added).

Further:

Under the Senate bill and the House amendment public agencies are shielded from liability for violations of section 7 of the FLSA which occur prior to the effective date, April 15, 1986.

*Id.* at 9, *reprinted in, U.S.Code Cong. & Ad.News* 671 (1985).

Adding impetus to the apparent fact that Congress intended the subject amendments to negate any immediate impact by *Garcia* is the pointed manner in which certain employees engaged in *nontraditional* governmental functions were singled out:

The amendments made by this Act shall not affect whether a public agency which is a State, political subdivision of a State, or an interstate governmental agency is liable under section 16 of the Fair Labor Standards Act of 1938 for a violation of section 6, 7, or 11 of such Act occurring before April 15, 1986, with respect to any employee of such public agency who would have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985, and published in section 775.3 of title 29 of the Code of Federal Regulations.

*P.L.* 99–150 § 7, *reprinted in, U.S.Code Cong. & Ad.News* 99 Stat. 791 (1985).

In plain English, what that section means is explained as follows:

[T]hese amendments do not affect whether employees of state and local governments who are engaged in nontraditional functions as defined by the DOL at 29 CFR 775.3—notably local mass transit systems—are covered by the FLSA prior to April 15, 1986. The Committee is aware that the question whether transit employees, prior to the decision in *Garcia,* were entitled to FLSA compensation for overtime hours worked is still being litigated in federal court. The amendments are intended to protect the rights of both sides to resolve their differences through litigation, without taking a position on the matter.

*S.Rep. No.* 99–159 at 15, *reprinted in,* *U.S.Code Cong. & Ad.News* 663 (1985).

Congressional intent to declare a moratorium and thereby forestall the economic impact of *Garcia* is manifest. It is readily apparent that no "window" exists between passage of the amendments and their effective date. Somewhat more complicated, perhaps, is the equally apparent observation that Congress also intended to cut off liability incurred as a result of *Garcia* *nunc pro tunc* to the date the decision was announced. One might reasonably ask whether the power of Congress, plenary as it is in exercising authority under the Commerce Clause, is adequate to step into previously-filed litigation and terminate a party's substantive rights. Given the unique aspects giving rise to this case, the Court concludes that Congress does have such power.

The general rule in the Ninth Circuit governing legislative retroactivity is set forth in *Matter of Reynolds,* 726 F.2d 1420 (9th Cir.1984):

> The retroactive application of a federal statute (other than an ex post facto law or a bill of attainder) is not forbidden under the Constitution so long as due process requirements are met.... Indeed, as a general rule, a judge should apply the law in effect on the date of decision.

*Id.* at 1422 (citations omitted).

*Reynolds* considered retroactivity to be the general rule regardless of whether the change in law was judicial, statutory, or constitutional:

> unless an exception to the limited retroaction rule is applicable. Legislation is not applied to pending cases where Congress has expressly directed that the law is prospective only or where manifest injustice would result from a retrospective application.

**4.** January 1, 1975 is the date of basic coverage for fire fighters under the FLSA. See 29 U.S.C. § 207(k). In addition, Congress contemplated a phase-in plan whereby coverage would improve on a yearly basis with regard to maximum

*Id.; see also, United States v. Ford,* 737 F.2d 1506, 1508 (9th Cir.1984).

Notwithstanding the certitude with which *Reynolds* approached the question, or the antiquity of authorities relied upon, there is a countervailing view that federal legislation is presumptively prospective only, at least in situations in which a party may lose substantive rights. *Cf., Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir.1985). Splitting the difference between these two extremes is *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1504 (9th Cir.1984) ("A statute will not be given retroactive effect absent clear legislative intent"). In the face of an apparent intra-circuit conflict, reliance will be placed on *Reynolds* and *Menhorn* for several reasons. First, *Friel*'s discussion may be characterized as dicta since the statutory modification under examination in that decision was procedural and not substantive. Second, as a practical matter, there is room for doubt as to the substance of the rights asserted by plaintiff in the instant case.

The rights asserted are based on the 1974 FLSA amendments which, for purposes of the instant action, became effective on January 1, 1975. P.L. 93–259; 88 Stat. 55, § 6(c)(1)(A).[4] Such rights were terminated in mid-1976 by *National League of Cities.* Those rights were revived nine years later by operation of *Garcia.* In the final analysis, however, the *Garcia* Court created no rights on its own authority. Minimum wages and overtime are not, when all is said and done, the result of principles known to the common law. Rather, *Garcia* merely gave force to rights created by Congress. If in its wisdom Congress chooses to impose a moratorium on the availability of substantive rights created in the first instance only by legislative action, it is likely well within its plenary powers under the Commerce

hours of work before overtime would be triggered. Counsel appear to have conceded during oral argument that their dispute over the formulae embodied in § 207(k) presents a damages question rather than a liability issue.

Clause to do so, at least in the absence of a due process violation. Given the fact that neither governmental employers nor their employees knew they had any rights or duties under the 1974 FLSA amendments pre-*Garcia,* and in point of fact had none, it is difficult to see how anyone could have relied upon the efficacy of those amendments.

### IV. Conclusion

The alternative rationales employed in resolving the instant motions cannot be read in isolation. The observation that Congress made a reasoned, policy-based decision to spare the States and their subdivisions the budgetary shock of immediate compliance with *Garcia* also serves to buttress the earlier conclusion that *Garcia* should not be applied retroactively. It would, after all, be the height of incongruity to deem *Garcia* as applying *only* retroactively and not prospectively. The net result is that the Court deems *Garcia* non-retroactive and the 1985 FLSA amendments to be retroactive.

Is there an inconsistency of approach here in that the Court has construed principles governing judicial retroactivity perhaps too constrictively and legislative retroactivity perhaps too expansively? On the contrary, the focal point of inquiry has remained the same; *viz.,* is it fair to change the rules of the game once the bets are down. The answer is in the negative if the wager is substantial, the rules initially well-settled, and the change in rules outcome-determinative. The answer is in the affirmative if no one knew there was even a bet on the table.

THEREFORE IT IS ORDERED that:

(1) Plaintiffs' Motion for Summary Judgment is DENIED.

(2) Defendant's Motion for Summary Judgment is GRANTED.

(3) This action is DISMISSED.

(4) The Clerk shall enter judgment accordingly.