Abdus-Salaam, J.
(dissenting). The majority holds that petitioner Walter E. Carver, who received government assistance under the City of New York’s work experience program (WEP), was an “employee” of the City within the meaning of the federal Fair Labor Standards Act (FLSA) (see 29 USC § 201 et seq.), and that therefore the minimum wage provisions of that statute entitle him to withhold a portion of his lottery winnings that would otherwise be owed to the New York State Office of Temporary and Disability Assistance (OTDA) pursuant to Social Services Law § 131-r. Tellingly, the majority does not dispute that FLSA and the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) (see Pub L 104-193, 110 US Stat 2105 [104th Cong, 2d Sess, Aug. 22, 1996]) do not expressly declare that public assistance recipients who must meet work requirements are employees of the government for FLSA purposes. Nor does the majority contend that the legislative history of those statutes reveals that Congress viewed petitioner and other such public assistance or “workfare” recipients as government “employees” who could obtain the benefits of FLSA. Rather, in the absence of clear textual or historical support for its conclusion that WEP participants are City “employees” within the meaning of FLSA, the majority maintains that an evaluation of petitioner’s relationship with the City under the “economic reality” test, which the United States Supreme Court has adopted to determine whether an individual is the type of “employee” that Congress meant to protect via FLSA (see Goldberg v Whitaker House Cooperative, Inc., 366 US 28, 33 [1961]), reveals that he is protected by FLSA.
*286 However, while courts should employ the economic reality test to ensure FLSA coverage for the broad class of individuals whom Congress truly meant to protect under the statute, the test cannot be used as a mere device to skip over the glaring lack of any legislative support for the extension of the statute’s minimum wage provisions to public assistance or workfare recipients. Indeed, the economic reality test “does have its limits,” and chief among them is the principle that the application of the test must be “consistent with congressional direction” (Tony & Susan Alamo Foundation v Secretary of Labor, 471 US 290, 295-296 [1985], quoting Mitchell v Lublin, McGaughy & Associates, 358 US 207, 211 [1959]). Consonant with that most important limitation, the United States Court of Appeals for the Tenth Circuit has concluded that Congress did not intend to confer the protections of FLSA upon public assistance recipients simply because those individuals must meet certain conditions and engage in work activities in order to continue receiving government benefits (see Johns v Stewart, 57 F3d 1544, 1558 [10th Cir 1995]). Thus, as the Tenth Circuit’s analysis demonstrates, and as the text and history of the relevant statutes show, petitioner and other similarly situated individuals are not “employees” within the meaning of FLSA, but instead receive government benefits in exchange for performing tasks relevant to the goals of PRWORA. Because the majority’s contrary holding runs afoul of that persuasive authority and does not comport with any sort of reality, economic or otherwise, I respectfully dissent.
L
The text and history of FLSA and PRWORA refute the majority’s conclusion that, in enacting those statutes, Congress placed local governments and beneficiaries of government assistance in an employer-employee relationship that falls within the scope of FLSA. Regarding FLSA, that statute establishes, among other things, a minimum wage and a maximum number of work hours for any covered “employee,” and the statute unhelpfully defines that critical term as “any individual employed” — that is, “suffered] or permitted] to work” — by “an employer” (29 USC §§ 203 [e] [1]; [g]; see 206 [a] [1]; 207 [a]). In adding context to the vague term “employee,” the statute specifies that some people who perform work for the government are protected “employees,” but, significantly, it does not list public assistance recipients among them; rather, the statute lists a variety of traditional government positions which would entitle their occupants to the protections of FLSA, and nothing *287 on that list mentions, applies to, or describes public assistance recipients in a manner that would qualify them as statutory “employees” (see 29 USC § 203 [e] [2] [A]-[C]). In fact, the statute does not refer to the recipients of government assistance at all, belying the majority’s contention that the statute sets the wages and working conditions of those to whom the government gives benefits in exchange for their satisfaction of work-related requirements.
Nor does it seem that Congress had recipients of government benefits in mind when it passed and then amended FLSA over the years, for Congress appears to have focused primarily on rooting out abusive labor practices in traditional employment relationships established by commercial enterprises and their nonprofit or governmental equivalents. In its official declaration of the policy behind FLSA and its amendments, Congress expressed concern that “industries engaged in commerce or in the production of goods for commerce” had established “labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers,” which conditions were harmful to, and spread via the abuse of, interstate commerce (29 USC § 202 [a] [emphases added]). As a result, FLSA made it the policy of the federal government “to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power” (29 USC § 202 [b] [emphasis added]).
Upon the initial passage of FLSA in 1938, President Roosevelt likewise suggested that FLSA was intended to address the abuse of laborers who had been hired by commercial enterprises to produce goods in exchange for a wage, rather than assistance recipients, for he described FLSA as necessary legislation to combat “the evil of child labor” and “the exploitation of unorganized labor,” which were incompatible with “[e]nlightened business” and would allow “[g]oods produced under conditions which do not meet rudimentary standards of decency” to “pollute the channels of interstate trade” (HR Rep 93-913, 93rd Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News at 2811, 2818 [quoting the 1937 speech without attribution]). Subsequent amendments to FLSA also reflected Congress’s desire to protect traditional commercial workers, not public assistance recipients, as Congress increased the minimum wage and expanded FLSA’s coverage to student workers, retail workers and domestic service workers (see Pub L 93-259, 88 US *288 Stat 55 [93rd Cong, 2d Sess, Apr. 8, 1974]; HR Rep 93-913, 93rd Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News at 2811). Along those lines, upon debating the 1974 amendments to FLSA, Senators did not once mention public assistance recipients or similar individuals, instead focusing on the plight of child laborers on farms, domestic workers, firemen and the like (see 120 Cong Rec S4691-S4702 at 43-45 [daily ed Mar. 28, 1974]).
Even when congressional reports condemned those who sought to use misleading labels or hidden arrangements to disguise the type of employer-employee relationship to which FLSA would obviously apply, they did not make any reference to public assistance recipients, either in general or in the context of state programs that feature work-related requirements for the acquisition of assistance. Instead, Congress sought to remedy situations where commercial employers established labor arrangements with students and minors, who would otherwise be covered by the statute, and yet improperly tried to hide the true nature of those employer-employee relationships to avoid complying with the statute (see 120 Cong Rec S4691-S4702 at 37-42 [daily ed Mar. 28, 1974]). Therefore, the text and history of FLSA reveal that, in general, the statute covers only ordinary wage earners hired by private and public employers to send goods and provide services via the channels of interstate commerce, and that public assistance beneficiaries are not covered.
In the same vein, PRWORA does not apply the provisions of FLSA to participants in workfare programs administered under the statute. Although PRWORA does expressly grant the protections of some other federal statutes to participants in programs funded pursuant to that law, FLSA is not among them (see 42 USC § 608 [d], as added by Pub L 104-193, tit I, § 103 [a] [1], 110 US Stat 2105, enacting PRWORA of 1996, tit IV, § 408 [c], as amended), and consequently, PRWORA does not bring workfare recipients within the ambit of FLSA. In fact, PRWORA distinguishes between workfare participants and the sort of “employees” who might qualify for the protections of FLSA in several notable ways.
In that regard, while PRWORA compels individuals receiving temporary assistance for needy families to “participate] in work activities,” such as unsubsidized employment, subsidized *289 employment, job training or work experience (42 USC § 607 [c] [1] [A]; [d] [1]-[12], as added by Pub L 104-193, tit I, § 103 [a] [1] , 110 US Stat 2105, enacting PRWORA of 1996, tit IV, § 407 [c] [1] [A]; [d] [1]-[12]), the act does not treat this “work activities” requirement as some form of public sector employment that might trigger the provisions of FLSA. PRWORA neither labels program participants as “employees” nor labels the state as their “employer,” and it contains measures crafted to place program participants in actual “employment” in the private sector, as distinct from the participants’ existing positions as the recipients of government benefits (see e.g. 42 USC §§ 604 [f] [allowing states to use PRWORA funds to pay for agencies that provide “employment placement services” to people who are not employees but rather are “individuals who receive assistance under the State program funded under this part”]; 608 [b] [2] [A] [i] [states may prepare individual responsibility plan that “sets forth an employment goal for the individual and a plan for moving the individual immediately into private sector employment”]; 607 [d] [4] [“work experience” in repairing public housing and similar roles qualifies as requisite “work activities” only “if sufficient private sector employment is not available”], as added by Pub L 104-193, tit I, § 103 [a] [1], 110 US Stat 2105, enacting PRWORA of 1996, tit IV, §§ 404 [f]; 408 [b] [2] [A] [i]; 407 [d] [4]). In addition, PRWORA refers to payments to program participants as “assistance” (see 42 USC §§ 604 [f]; 607 [e]) or “benefits” (42 USC § 601 [a] [2]) rather than wages paid to an employee, and in imposing a penalty upon any participant who fails to meet the mandatory work requirements, the statute declares that such a penalty “shall not be construed to be a reduction in any wage paid to the individual” (42 USC § 608 [c] [emphases added], as added by Pub L 105-33, tit V, subtit A, § 5001 [h] [1] [B], 111 US Stat 251, amending PRWORA of 1996, tit IV, § 408 [c]), thereby clarifying that participants are not employees who receive a wage from the government.
Moreover, the application of FLSA’s minimum wage, overtime and other provisions to workfare participants is incompatible with PRWORA’s primary goal of moving people off the public assistance rolls and into unsubsidized regular jobs, instead of making public assistance recipients state “employees” who are guaranteed a minimum wage subsidized by the federal govern *290 ment.[1] As the act’s official statement of purpose puts it, PRWORA is meant to “increase the flexibility of States in operating a program designed to . . . end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage” (42 USC § 601 [a] [2], as added by Pub L 104-193, tit I, § 103 [a] [1], 110 US Stat 2105, enacting PRWORA of 1996, tit IV, § 401 [a] [2]), and thus, Congress could not have intended to limit states’ flexibility in cutting benefits and incentivizing departure from the public assistance rolls by forcing the states to guarantee beneficiaries assistance in the amounts of the minimum wages specified by FLSA. Indeed, far from seeking to make a generous offer of state “employment” to workfare participants at a “wage” equivalent to FLSA’s minimum wage, the House members who supported PRWORA bemoaned the fact that, prior to the act’s passage, public assistance recipients were allegedly receiving benefits in excessive amounts far greater than the salary of many regularly employed individuals, and they wished to make the new workfare programs less generous, not more, than the sort of ordinary employment to which FLSA’s minimum wage provisions would apply (see HR Rep 104-651, 104th Cong, 2d Sess at 4, reprinted in 1996 US Code Cong & Admin News at 2183, 2185). In short, the express terms of FLSA and PRWORA do not apply FLSA’s protections to workfare recipients, and Congress plainly intended to establish the kind of arrangement between the government and workfare beneficiaries that would remove them from the ambit of FLSA.
IL
The majority does not seriously contest the clear evidence that Congress had no intention of turning participants in PRWORA programs into government “employees” covered by FLSA, but it insists that WEP participants qualify as government “employees” within the meaning of FLSA under the economic reality test (see majority op at 280-284). However, where, as here, Congress’s intent to exempt a class of individuals from the reach of FLSA is plain from the text and history of relevant statutes, the judge-made economic reality test cannot *291 serve to confer FLSA’s protections upon those who Congress thought should not receive the statute’s benefits because, as previously noted, a court must apply the test in a manner consistent with Congress’s intent (see Tony & Susan Alamo Foundation, 471 US at 295-296; cf. O’Connor v Davis, 126 F3d 112, 115 [2d Cir 1997]). Indeed, as will be explained herein, when the economic reality test is properly applied in light of the legislative scheme, it leads to the inescapable conclusion that petitioner is not a City “employee” for FLSA purposes.
A.
The Supreme Court has not exhaustively defined the parameters of the economic reality test or set forth any particular list of factors to be considered in every case. However, the Court has indicated that one must look at “the circumstances of the whole activity” of the parties to discern the economic reality of a person’s status under FLSA (Rutherford Food Corp. v McComb, 331 US 722, 730 [1947]). In conducting that practical and comprehensive analysis, the Supreme Court has focused on the individual’s expectation of wages or in-kind remuneration beyond what one might expect as a trainee or student (see Tony & Susan Alamo Foundation, 471 US at 299-300; Walling v Portland Terminal Co., 330 US 148, 150-153 [1947]), the employer’s ability to “expel [workers] for substandard work or for failure to obey [workplace rules]” (Goldberg, 366 US at 33), and the employer’s arrangement of its enterprise as a “device” which is “transparent[ly]” designed to evade FLSA’s strictures (id.). Similarly, the United States Courts of Appeals have attempted to distill the Supreme Court’s precedents and Department of Labor regulations regarding the economic reality test into a multifactor framework, concluding that “the relevant factors include ‘whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records’ ” (Herman v RSR Sec. Servs. Ltd., 172 F3d 132, 139 [2d Cir 1999], quoting Bonnette v California Health & Welfare Agency, 704 F2d 1465, 1470 [9th Cir 1983]; see also Hodgson v Griffin & Brand of McAllen, Inc., 471 F2d 235, 237-238 [5th Cir 1973]).
In Johns v Stewart (57 F3d at 1544), the Tenth Circuit concluded that, under the economic reality test, workfare par *292 ticipants in Utah were not the State’s “employees” for FLSA purposes (see id. at 1556-1559). The court determined that, because the workfare participants had to meet financial, training and other criteria beyond the performance of work in order to receive benefits, the participants were not receiving benefits as a form of wage solely in exchange for work, and in light of the unusual tax and payroll treatment of the participants’ benefits payments, Utah had not established a typical employment relationship with those individuals (see id. at 1558-1559). While the court recognized that not every aspect of the workfare program differed from employment, the court eschewed reliance on such isolated factors or any rigid application of a multifactor test, instead following “the Supreme Court’s direction to focus upon the circumstances of the whole activity and the economic reality of the relationship” (id. at 1559 and n 21). Thus, observing that “[t]he work component of [Utah’s workfare programs] [wa]s just one requirement of the comprehensive assistance programs,” the court concluded that, under the circumstances of the whole activity of the State and the beneficiaries, “[t]he overall nature of the relationship between [the workfare participants] and [the State] [wa]s assistance, not employment” (id. at 1558).
Johns persuasively shows that a workfare participant generally cannot avail him- or herself of FLSA’s minimum wage specifications. As Johns recognizes, under most workfare programs, a state does not hire, fire and supervise employees or pay them a wage in a traditional sense, but instead makes public assistance beneficiaries meet many different criteria, such as financial, family-related and work requirements, to obtain government assistance and job training so that they can transition into actual employment in the public or private sector. In addition, Johns makes the commonsense point that “the circumstances of the whole activity” of workfare participants and the government are fundamentally different from those of employers and employees whose relationship is governed by FLSA, notwithstanding that the two arrangements may share some “isolated factors” in common (Rutherford Food Corp., 331 US at 730).[2]
*293 Under the rationale of Johns and the relevant considerations identified by the Supreme Court and the lower federal courts, petitioner here was not an “employee” of the City and hence was not entitled to collect a minimum wage under FLSA. In particular, the City did not have the power to “hire” petitioner to fill an existing position left vacant by layoffs or other circumstances, as the law specifically forbids the City to replace an actual City employee with a WEP participant (see Social Services Law § 336-c [2] [e]; 42 USC § 607 [f] [2]). And, although the City had the power to reduce petitioner’s benefits based on his complete failure to participate in work activities (see Social Services Law §§ 131 [5]; 336), the City could not “fire” him in the sense of “expelling” him from the program based solely on “substandard work or for failure to obey [workplace rules],” as opposed to a complete refusal to work (Goldberg, 366 US at 33).
Furthermore, petitioner could not have had any expectation of remuneration of the kind that would make him a City “employee,” as he was more akin to a student or trainee who trained for full-time employment in the ordinary work force by engaging in work activities as one of the conditions of receiving government assistance (see Walling, 330 US at 150-153). Indeed, both federal and New York law establish the clear expectation and reality that petitioner was not earning a wage in exchange for his work because the law declares that his benefits were not the equivalent of wages (see 42 USC § 608 [c]; 18 NYCRR 385.9 [a] [4]; see also 42 USC §§ 604 [i]; 607 [e]), and the amount of his benefits was not only based on the number of hours he worked, but also on his needs and family size, which were matters unrelated to his work activities (see Social Services Law §§ 131 [4]; 131-a).[3] Moreover, the City did not structure the WEP program as a “device” to skirt FLSA’s requirements and flood the channels of interstate commerce with goods and services unfairly generated at below-market rates in substandard labor conditions (Goldberg, 366 US at 33). Instead, the City makes petitioner and other WEP participants perform job-related tasks in order to develop valuable skills for *294 their planned departure from the program and entry into genuine employment.
B.
The majority posits that, since petitioner did not learn any skills in a classroom or participate in a formal and systematic apprenticeship, the City used its professed desire to train and educate petitioner as a charade to disguise an ordinary employment situation subject to FLSA requirements (see majority op at 281-282). However, petitioner’s work experience in a professional setting was no less educational than the process of obtaining job skills via classwork. By taking part in the WEP program, petitioner learned how to meet workplace expectations such as timely arrival at a job site, how to interact productively with colleagues, and how to complete his assignments properly — among the most essential and universal job skills. In fact, petitioner’s hands-on training may have been more valuable to him than any academic discourse on professional development.
The majority also believes that, because the Social Services Law calculates a WEP participant’s work hours by dividing the amount of his or her benefits by the minimum wage (see Social Services Law § 336-c [2] [b]), the statute deems a WEP participant’s benefits to be wages, akin to the minimum wage, which must be paid as part of an employer-employee relationship covered by FLSA (see majority op at 284-285). But the New York statute’s use of the minimum wage as a numerical factor to be considered in setting the work hours of WEP participants does not remotely indicate that WEP benefits are wages or that the legislature meant to give participants the minimum wage. To the contrary, the legislature may have simply sought to use the number of hours that a minimum wage earner might work in exchange for a particular amount of money as a convenient preexisting bench mark of a standard, fair number of working hours for WEP participants, who need to adjust to such conditions that prevail in the regular work force which they hope to enter. Surely, the legislature did not transform WEP participants into government employees by choosing the expedient of a maximum hours formula based on a familiar metric of appropriate working conditions, rather than inventing a new formula from scratch. Beyond that, as the majority concedes (see majority op at 280-281), this statutory formula weighs against a finding that petitioner was a City “employee” under FLSA because the statute, and not the *295 City, “determined the rate and method of payment” of petitioner’s benefits (Herman, 172 F3d at 139 [internal quotation marks omitted]).
The majority insists that WEP is akin to the thinly disguised commercial enterprise at issue in Tony & Susan Alamo Foundation v Secretary of Labor (471 US at 290), which enterprise was found by the Supreme Court to be subject to FLSA (see id. at 295-303). But, that case is readily distinguishable from the one before us. In Tony & Susan Alamo Foundation, a nonprofit organization with an avowed religious purpose operated a plethora of “commercial businesses, which include[d] service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy” (id. at 292). The workers at those businesses, called “associates,” were needy, homeless or drug-addicted individuals ostensibly aided and rehabilitated by the organization (id.). The organization gave the associates in-kind benefits, but not cash, in return for their labors (see id.). The Secretary of Labor commenced a regulatory action against the organization, asserting that, among other things, it “employed” the associates within the meaning of FLSA and yet had not complied with FLSA’s minimum wage and overtime provisions (see id. at 293). The organization countered that it was not an “enterprise engaged in commerce” to which FLSA applied; FLSA coverage would violate its rights under the Free Exercise Clause of the First Amendment; and it was exempt from FLSA’s strictures because the associates were “volunteers,” not “employees” within the meaning of FLSA (id. at 293-295).
The Supreme Court held that the organization had to comply with FLSA (see id. at 293-295, 299-303, 306). First, the Court concluded that, because the lower courts had appropriately found that the organization ran commercial enterprises in competition with other ordinary businesses, the organization was a “commercial enterprise” subject to FLSA (see id. at 295-299). Noting that it had “consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction,” the Court determined that neither the organization’s expressed religious purpose nor its offer of services and food to the associates removed it from the ambit of the statute because both formal Department of Labor regulations and federal judicial decisions had established that the religious or charitable nature of an otherwise commercial enterprise did not serve to remove it from the reach of the *296 statute {id. at 296-299 [internal quotation marks and citation omitted]). Importantly, the Court observed that “[t]he legislative history of the Act support [ed] this administrative and judicial gloss,” and the Court relied on extensive legislative history showing that Congress intended to regulate enterprises like the organization under FLSA {id. at 297-298).
Furthermore, in the Court’s view, the organization’s associates were “employees” under FLSA based on the overall economic reality of their relationship with the organization {see id. at 299-303). The Court noted that, unlike students or trainees, the associates “must have expected to receive in-kind benefits — and expected them in exchange for their services”— such that those benefits were “wages in another form” {id. at 301 [emphasis added]). In addition to that expectation of wages, the Court relied on a number of factors that supported its determination that the associates were statutory “employees,” including their many years of service and near-total dependency on the organization, their long work hours, their payment “on a ‘commission’ basis,” and their having been “ ‘fined’ ” severely “for poor job performance” {id. at 301 and n 22). Furthermore, the Court rejected the notion that the associates could opt out of the statute’s coverage, declaring that a supposedly voluntary waiver of the statute’s protections would undermine the statute’s goal by ultimately driving down “wages” in “competing businesses” {id. at 302). Finally, the Court rebuffed the organization’s First Amendment argument and held that the associates could receive the protections of FLSA {see id. at 303-306).
Unlike the enterprise at issue in Tony & Susan Alamo Foundation, WEP is not the sort of commercial enterprise that FLSA seeks to regulate, as WEP does not compete with other businesses in the production of goods or supply of services in the channels of interstate commerce. And, as discussed, WEP participants like petitioner are not employees of the City because, while they may expect to obtain government assistance upon meeting a combination of work-related and other criteria, they do not expect those benefits solely “in exchange for their services” (id. at 301), as did the associates in Tony & Susan Alamo Foundation. Furthermore, although the City may penalize WEP participants for failure to meet minimal requirements of attendance and hours at work, the City does not, unlike the organization in Tony & Susan Alamo Foundation, reward or punish participants based on the quality of their *297 work, as an ordinary commercial employer might, by giving them benefits on a “ ‘commission’ basis” or “ ‘fin[ing]’ [them] heavily for poor job performance” (id. at 301 n 22). More fundamentally, in Tony & Susan Alamo Foundation, the text and history of FLSA supported the conclusion that the entity in question had to comply with FLSA, whereas those authorities support the opposite conclusion here. It is not surprising, then, that the Tenth Circuit in Johns observed that Tony & Susan Alamo Foundation was fully consistent with the conclusion that workfare participants cannot obtain the protections of FLSA (see Johns, 57 F3d at 1557, citing Tony & Susan Alamo Foundation, 471 US at 295).
The majority’s reliance on a Department of Labor document expressing the view that workfare recipients are “employees” within the meaning of FLSA is equally misplaced (see majority op at 279-280). While the Department of Labor’s views are entitled to significant consideration based on its role as the agency charged with administering FLSA (see Tony & Susan Alamo Foundation, 471 US at 297), the deference owed to the agency’s interpretation of the statute depends primarily on its “power to persuade” (Christensen v Harris County, 529 US 576, 587 [2000]), and in this instance, the persuasive power of the Department’s document pales in comparison to the clear language, history and case law demonstrating that workfare participants are not government employees.[4] So, too, administrative guidance carries considerably less weight where, as here, it comes in the form of a document that has not been issued as “a formal adjudication or notice-and-comment rule-making” {id.).[5]
*298 United States v City of New York (359 F3d 83 [2d Cir 2004]), cited by the majority (see majority op at 282), is inapposite. There, the Second Circuit held that WEP participants are covered by title VII of the Civil Rights Act of 1964 (see 359 F3d at 86-87), and in dictum, the court signaled that it might endorse the Department of Labor’s view that FLSA covers workfare participants (see id. at 94). Obviously, the dictum in City of New York does not supply binding authority on the issue at hand, nor is it even persuasive, as it merely restates the Department of Labor’s informal guidance without supplying significant analysis of the text and history of FLSA and PRWORA relating to this issue. In addition, while title VII, like FLSA, is not among the statutes explicitly referenced by PRWORA, the Second Circuit’s determination that title VII nonetheless applies to workfare participants does not compel a similar conclusion with respect to FLSA. After all, some provisions of PRWORA reflect Congress’s desire to administer workfare programs on a nondiscriminatory basis (see e.g. 42 USC § 608 [d]), and as a result, the application of title VII protections to workfare participants would not offend against the legislative intent behind PRWORA in the same manner as the coverage of such individuals under FLSA. Indeed, given Congress’s broad desire to ensure that all assistance recipients would receive the job skills they needed via work experience programs under PRWORA, it is hard to imagine that Congress wished to leave the states free to offer the benefits and responsibilities of PRWORA only to certain people on a piecemeal, discriminatory basis.[6]
*299 Finally, the majority’s holding, in addition to lacking any legal basis, may raise serious practical problems. Under the majority’s rationale for deeming WEP participants to be City employees, taxpayers may ultimately have to foot the bill for an array of new expenses, including overtime, annual leave and sick leave. Collective bargaining rules may soon apply to all workfare recipients, not just those who participate in a subsidized public employment program with an outside employer (see Social Services Law § 336-e), thereby stymieing the orderly administration of WEP. And, the city, state and federal governments may have to reconcile the ordinarily tax-exempt status of WEP participants’ assistance payments with the implication of today’s decision that WEP participants essentially earn those payments as the sort of “wages” that are generally taxed in a regular employment context. The majority may protest that its holding can be confined in one way or another, but given the majority’s imaginative characterization of workfare and invocation of legal authorities from clearly distinguishable contexts, attempts to limit the impact of the majority’s decision to this case and this minimum wage statute will prove difficult at best and futile at worst. I would avoid this mess and follow existing law.[7]
m.
In its effort to fit the square peg of assistance into the round hole of employment under FLSA, the majority defies the will of Congress, ignores the teachings of the Supreme Court and needlessly creates a split in authority between this Court and the Tenth Circuit. Because the majority’s decision sows confusion in this important area of federal law, courts throughout New York and, potentially, the Nation must now struggle in vain to reconcile the majority’s illogical holding with the relevant legislative scheme and common sense, and thus the majority’s opinion will likely reverberate in unfortunate ways *300 throughout the legal system. Since the plain language of FLSA and PRWORA, as well as the legislative purpose behind those statutes, show that WEP participants are not City “employees” entitled to the protections of FLSA, I dissent and vote to reverse the order of the Appellate Division.
Judges Rivera, Stein and Fahey concur; Judge AbdusSalaam dissents in an opinion in which Judge Pigott concurs.
Supreme Court judgment appealed from and Appellate Division order insofar as sought to be reviewed affirmed, without costs.

. In passing similar legislation prior to PRWORA, the New York Legislature also expressed a desire to reduce the number of public assistance recipients in the state and encourage them to transition to genuine full-time employment in the private sector (see generally Bill Jacket, L 1990, ch 453; see also Bill Jacket, L 1997, ch 436).

. To be sure, Johns predates PRWORA, but that is of no moment because, as explained above, PRWORA actually strengthens the rationale of Johns by revealing Congress’s intent to place workfare participants in a very different position than that of an “employee” under FLSA.

. In fact, unlike wages that can be freely spent by an employee and taxed by the government, state and federal law place significant restrictions on the taxation and expenditure of workfare benefits (see 42 USC § 608 [a] [12] [A]; 18 NYCRR 381.1; see also 20 CFR 416.1124 [c] [2]; Internal Revenue Service Publication No. 525: Taxable and Nontaxable Income [1995-2013 eds]).

. Citing a congressional conference report on 1997 budget legislation, the majority claims that Congress “considered the DOL’s guidelines and accepted them” (majority op at 280). But, in the cited report, Congress merely mentioned the existence of the Department’s opinion on the subject of FLSÁ coverage for workfare participants, noted the House’s view that workfare participants were not entitled to wages or a salary in any traditional sense, and declined to pass any legislation addressing that specific issue (see HR Rep 105-217, 105th Cong, 1st Sess at 934, reprinted in 1997 US Code Cong & Admin News at 176, 555). Congress certainly did not agree to enact the Department’s guidance on this issue into law, and its failure to invalidate the Department’s document, unlike the failure to overrule a binding Supreme Court decision on the subject, is hardly a sign that the agency’s guidance has become the law of the land.

. As the majority observes (see majority op at 280 n 1), the Department of Health and Human Services has issued a formal regulation indicating that *298 participants in programs governed by PRWORA are protected by FLSA (see 45 CFR 260.35). But, the Department of Health and Human Services is charged with joint responsibility for interpreting PRWORA, not FLSA, and hence its opinion on the meaning of FLSA is entitled to even less respect than that of the Department of Labor. In any event, as previously noted, the views of administrative agencies simply cannot override the text, history and judicial interpretations of FLSA.

. To the extent cases dealing with employment issues outside the FLSA context are relevant, we should follow the logic of our own decision in Brukhman v Giuliani (94 NY2d 387 [2000]) instead of the Second Circuit’s decision in City of New York. In Brukhman, we decided that WEP participants are not government employees protected by the prevailing wage provision of the State Constitution (see Brukhman, 94 NY2d at 391-397). Although we were careful to limit our holding to the interpretation of that constitutional provision (see id. at 397), we reached the conclusion that WEP participants are not City “employees” under the Constitution based on many of the same factors which demonstrate that they are not City “employees” under FLSA, *299 including the lack of any salary paid to participants in direct exchange for their services and WEP’s goal of moving participants from a government assistance program into genuine employment (see id. at 395-396). In light of those factors and the others listed above, petitioner and other WEP participants are not “employees” of the City within the meaning of FLSA.

. It is unclear under the majority’s decision whether the government would ever be able to recoup lottery winnings from a WEP participant, since the government does not recover wages that it pays to employees. Presumably, even if petitioner had won a multi-million dollar lottery prize, the majority would let him keep every penny.