**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1145**

ALEXIS DEGIDIO, individually and on behalf of all others similarly situated,

  Plaintiff - Appellee,

v.

CRAZY HORSE SALOON AND RESTAURANT INC, d/b/a Thee New Dollhouse,

  Defendant - Appellant,

and

JOSEPH B. HARGADON,

  Third Party Defendant.

Appeal from the United States District Court for the District of South Carolina, at Florence.  Bruce H. Hendricks, District Judge.  (4:13-cv-02136-BHH)

Argued:  December 5, 2017                           Decided:  January 18, 2018

Before WILKINSON, KING, and FLOYD, Circuit Judges.

Affirmed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Floyd joined.

**ARGUED:** James Leon Holt, Jr., JACKSON, SHIELDS, YEISER & HOLT, Cordova, Tennessee, for Appellant. Jamisen A. Etzel, CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Gary Lynch, CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP, Pittsburgh, Pennsylvania, for Appellee.

---

WILKINSON, Circuit Judge:

Plaintiff-appellee Alexis Degidio filed a putative collective and class action against defendant-appellant Crazy Horse Saloon and Restaurant, Inc. (Crazy Horse). This appeal concerns the enforceability of arbitration agreements that were executed more than a year after this litigation began.[1]

Arbitration is a valuable means of resolving disputes expeditiously, but this case shows that it can sometimes be abused to prolong litigation, exploit the judicial process, and give defendants two opportunities to prevail on the merits. The district court denied Crazy Horse's motion to compel arbitration. For the reasons that follow, we affirm its judgment and remand for further proceedings consistent with this opinion.

Degidio also argues on appeal that because the National Labor Relations Act (NLRA) protects employees' right to "engage in . . . concerted activities for . . . mutual aid or protection," 29 U.S.C. § 157, it invalidates arbitration agreements that prevent employees from bringing class or collective actions against employers. This question is currently before the Supreme Court. *See Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016), *cert. granted*, 137 S. Ct. 809 (Jan. 13, 2017) (No. 16-285). Since we find the

---

[1] A collective action under the Fair Labor Standards Act (FLSA) differs from a class action under Federal Rule of Civil Procedure 23 because potential plaintiffs can join an FLSA collective action only by affirmatively giving consent in writing to become a party. 29 U.S.C. § 216(b). In a class action, by contrast, plaintiffs are presumed to be members of a class unless they affirmatively opt out of the class proceeding. Fed. R. Civ. P. 23(b)(3).

arbitration agreements infirm for reasons quite independent of the question raised in *Epic Systems*, we have no need to address that issue.

I.

Degidio performed as an exotic dancer at Crazy Horse's gentlemen's club in 2012 and 2013. Crazy Horse classified entertainers who performed at its club as "independent contractors." The entertainers were not paid by Crazy Horse, but were instead compensated through customer tips.[2]

Degidio filed this class and collective action on August 8, 2013. Degidio alleged that Crazy Horse misclassified her and other putative class members as independent contractors and that it further violated the minimum wage and overtime provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq*. Degidio also claimed that Crazy Horse violated the South Carolina Payment of Wages Act (SCPWA), S.C. Code § 41-10-10 *et seq.*, by failing to pay entertainers the appropriate minimum wages, improperly denying them overtime wages, and inappropriately withholding the entertainers' tips.

Over the course of litigation, Crazy Horse adopted three distinct strategies to defeat Degidio's claim. First, Crazy Horse attempted to win the judicial action on the merits by filing multiple motions for summary judgment. Second, it repeatedly asked the district court to certify questions of state law to the South Carolina Supreme Court. And third, it sought to compel arbitration on agreements executed after the commencement of

---

[2] Crazy Horse began to operate under the name "Thee New Dollhouse" on March 1, 2012.

4

this suit. Only after the district court had resolved on the merits a number of legal issues did Crazy Horse ask the court to enforce the arbitration agreements.

As the ensuing chronology makes clear, Crazy Horse was disdainful of orderly judicial process and lacking in the respect that opposing parties in an adversary proceeding are due. Crazy Horse began its maneuvers when it answered Degidio's complaint on October 8, 2013, but did not move to compel arbitration. The parties then participated in discovery until November 2014.

In November and December 2014, at the very end of the discovery period, Crazy Horse began entering arbitration agreements with entertainers who had worked at the club. The arbitration provision was contained in a lease that Crazy Horse distributed to entertainers who used its facilities. Crazy Horse told entertainers that they were required to sign the lease as a condition of performing at the club. The agreement waived the signatory's right to participate in any class action against Crazy Horse, including any class that might be certified in this case. Prior to executing the agreements, Crazy Horse did not inform the district court that it was communicating with potential class members about pending litigation.

In December 2014, Crazy Horse moved for summary judgment on all claims. Crazy Horse's motion for summary judgment relied on evidence obtained in discovery, including deposition testimony, to argue that its entertainers were legally classified as independent contractors and thus not entitled to the protections of the FLSA. Crazy Horse did not mention arbitration in this motion for summary judgment. The next day, Degidio

5

moved for Rule 23 class certification for the state law claims and conditional certification of a collective action under the FLSA.

On January 19, 2015, Crazy Horse opposed Degidio's motions for FLSA conditional certification and Rule 23 class certification and—for the first time in the litigation—argued that the district court should compel arbitration against any entertainers who had signed arbitration agreements.

In support of its motion to compel arbitration, Crazy Horse submitted signed declarations in which entertainers explained why they chose to sign the agreement. All of the entertainers stated that they preferred to be independent contractors because they enjoyed having the freedom to work at other clubs, set their own work schedules, and keep the money they received in tips. Crazy Horse also filed an affidavit from its CFO Laura Watson explaining that Crazy Horse had begun entering arbitration agreements with entertainers in November 2014.

On September 30, 2015, the district court granted in part and denied in part Crazy Horse's motion for summary judgment. Specifically, the district court dismissed two of Degidio's three SCPWA claims, those for minimum wages and overtime pay. The court found, however, that entertainers who performed at Crazy Horse were employees for purposes of the FLSA. Based on this finding, the district court granted Degidio's motion for conditional certification of an FLSA collective action and authorized Degidio's counsel to send notice to putative plaintiffs. The district court also "question[ed] the enforceability of the arbitration agreements as they pertain to this action." J.A. 478–81 (citing *Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 919 (11th Cir. 2014)). The

6

district court expressed concern "that potential class members have been misled about the nature of the plaintiff's claims, the implications of being classified as an employee, and what an employee would need to show to recover under the FLSA." J.A. 480.

Shortly after notice had been sent to potential class members informing them of their right to opt into Degidio's FLSA collective action, on October 26, 2015, Crazy Horse filed another motion for summary judgment. In the motion, Crazy Horse argued only that it was entitled to summary judgment on Degidio's remaining SCPWA claim. It again did not mention arbitration.

After Crazy Horse filed that summary judgment motion, between November 2015 and January 2016, more than a dozen new plaintiffs joined this litigation. Nine of those plaintiffs had signed the arbitration agreements Crazy Horse is trying to enforce in this appeal.

Moreover, on November 30, 2015, only a month after it had filed a motion for summary judgment on Degidio's SCPWA claims, Crazy Horse began serving written discovery on the opt-ins, including each opt-in who signed an arbitration agreement. Crazy Horse asked the opt-ins to produce documents relating to their sources of income, their work history, the number of hours they worked, and the remuneration they received from defendants. *See, e.g.*, *Miller Interrogatories*, J.A. 874-76. All of these questions probe merits issues that are relevant to Degidio's SCPWA and FLSA claims, but are unrelated to the question of arbitrability.

The district court denied Crazy Horse's motion for summary judgment on June 3, 2016. Seven days later, Crazy Horse moved to certify several questions of South Carolina

law to the South Carolina Supreme Court. The district court properly denied the motion because it had earlier ruled on the exact same questions at Crazy Horse's request.[3] Undeterred, Crazy Horse filed a second motion to certify the wages issue to the South Carolina Supreme Court on August 11, 2016.

Before the district court had ruled on Crazy Horse's second motion to certify state law questions to the South Carolina Supreme Court, on October 31, 2016, Crazy Horse filed another motion for summary judgment. The case had now been ongoing for more than three years, and more than nine months had passed since the latest opt-in had joined the FLSA collective action. This time, Crazy Horse sought to compel arbitration against the nine plaintiffs who had signed arbitration agreements in November and December 2014.

On January 26, 2017, the district court entered an omnibus order denying Crazy Horse's second motion to certify questions of state law, rejecting the motion to compel arbitration, and granting Degidio's motion for conditional class certification. As to arbitration, the court found that Crazy Horse had obtained the arbitration agreements through a unilateral, unsupervised, and misleading pattern of communication with absent class members initiated more than a year after the pendency of this case. J.A. 909. It thus declined to enforce the arbitration agreements. Crazy Horse now appeals this decision.

---

[3] Specifically, Crazy Horse argued that it was unclear whether "tips" qualified as "wages" for purposes of South Carolina law, and that the South Carolina Supreme Court should be given an opportunity to weigh in on this question. Crazy Horse had asked the district court to resolve this exact same question in an earlier motion for summary judgment. The district court did so seven days before Crazy Horse filed this motion.

## II.

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, adopted "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA recognizes that arbitration is an expeditious way to resolve disputes and conserve judicial resources. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001). It accordingly requires that courts stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Pursuant to this directive, courts generally respect contractual agreements to settle disputes via arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts.").

However, the policy undergirding the FAA is not without limits. "A litigant may waive its right to invoke the Federal Arbitration Act by so substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir. 1987) (quoting *Maxum Foundations, Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985)). This is because "[a]rbitration laws are passed to expedite and facilitate the settlement of disputes and avoid the delay caused by litigation," not to provide "a means of furthering and extending delays." *Radiator Specialty Co. v. Cannon Mills*, 97 F.2d 318, 319 (4th Cir. 1938). "Two factors specifically inform our inquiry into actual prejudice: (1) the amount of the delay; and (2) the extent of the moving party's trial-oriented activity." *Stedor Enters., Ltd. v. Armtex, Inc.*, 947 F.2d 727, 730 (4th Cir. 1991).

9

Crazy Horse employed judicial proceedings to pursue a litigation strategy for over three years, and it did so to the detriment of plaintiffs in this case. Instead of filing a motion to compel arbitration at an early stage in the litigation process, Crazy Horse filed multiple motions for summary judgment, served discovery, and twice asked the district court to certify questions of state law to the South Carolina Supreme Court. This was litigation activity aimed at obtaining a favorable ruling on the merits of the case. In fact, Crazy Horse had already obtained favorable rulings from the district court to the effect that Degidio's claims for minimum wages and overtime under the SCPWA were preempted.

In pursuing this merits-based strategy for three years, Crazy Horse actively sought to obtain a favorable legal judgment. In doing so, it forced plaintiffs and the district court to spend unnecessary time and resources on issues that might have had to be reargued before an arbitrator. This conduct could not be more at odds with the FAA's goal of facilitating the expeditious settlement of disputes.

Of course, if the district court had granted any of Crazy Horse's motions for summary judgment, then arbitration would have been unnecessary: the district court would already have resolved the dispute and arbitration would serve no purpose. The only possible purpose of the arbitration agreements, then, was to give Crazy Horse an option to revisit the case in the event that the district court issued an unfavorable opinion. In other words, Crazy Horse did not seek to use arbitration as an efficient *alternative* to litigation; it instead used arbitration as an insurance policy in an attempt to give itself a second opportunity to evade liability.

Crazy Horse claims that it filed its motion to compel arbitration as quickly as possible. According to the club, it did not delay because it could not move to compel arbitration against parties who had yet to join Degidio's suit. And, because Degidio did not herself sign an arbitration agreement, Crazy Horse argues that there was no party against whom it could have moved to compel arbitration until after signatories had opted to join the action. This argument is doubly misguided.

The first difficulty with this argument is that it misrepresents the procedural history of the case. Crazy Horse began executing the arbitration agreements in November 2014. Crazy Horse did not need to wait to inform the district court about its arbitration strategy until entertainers who had signed arbitration agreements joined the case. It could instead have told the district court that it intended to compel arbitration with respect to any entertainers who elected to sign arbitration agreements and then proceeded to join Degidio's lawsuit. The fact that the arbitration agreements expressly mentioned this lawsuit suggests that Crazy Horse was well aware that the agreements were relevant to the ongoing litigation. Had Crazy Horse informed the district court of its intention to compel arbitration at this earlier stage of litigation, the trial judge would have been able to monitor communications between Crazy Horse and potential plaintiffs. As a practical matter, the district court could have waited to issue merits judgments until the prior arbitration question had been settled. In this way, the district court would not have had to decide legal questions that might ultimately be rehashed by the arbitrator.

As we have noted, however, rather than moving for arbitration, Crazy Horse proceeded to make a number of legal arguments before the district court over a period of

11

three years. For example, in December 2014, a few weeks after it began executing arbitration agreements, Crazy Horse filed a summary judgment motion asking the court to decide the case on the merits. Then, after Crazy Horse informed the court in January 2015 that many potential plaintiffs had signed arbitration agreements, the club filed two more merits-based summary judgment motions and asked the trial judge to certify questions of law to the South Carolina Supreme Court. Even after the opt-ins had joined the class, Crazy Horse continued to pursue a merits-based litigation strategy before asking the court to compel arbitration. For instance, Crazy Horse asked the district court to reconsider its order on Degidio's SCPWA claim and to again certify questions of law to the South Carolina Supreme Court. In addition, Crazy Horse served discovery on all of the opt-ins who had signed arbitration agreements. But rather than limit discovery to questions of arbitrability, Crazy Horse included interrogatories and requests for production on numerous details of the opt-ins' employment history and income. In doing so, Crazy Horse continued to act as though all of the claims would be disposed of in litigation—not in an arbitral proceeding.

There is a second reason to reject Crazy Horse's contention that it could not file a motion to compel arbitration until after the district court had conditionally certified an FLSA class. Such a ruling would give defendants a perverse incentive to wait as long as possible to compel arbitration. Generally, arbitration agreements are signed before the commencement of any litigation. When such agreements are executed during the pendency of litigation, there is an increased risk that arbitration will operate not to

expedite the resolution of disputes, but to prolong the entire process and to give defendants a second opportunity to contest unfavorable judgments.

This all turns the arbitral process on its head. Instead of giving the parties to an arbitration agreement one neutral arbiter, it grants defendant two bites at the apple. It is hard to escape the impression that defendants knew exactly what they were up to, and the district court was quite right to put a stop to it. By treating arbitration as a backstop and as a last resort rather than as a substitute for judicial proceedings, Crazy Horse pushed this case further and further from the FAA's mandate of helping parties resolve disputes expeditiously.

Moreover, the arbitration agreements that Crazy Horse presented to potential plaintiffs painted a false picture of the entertainers' legal posture. Specifically, the agreements suggested that the entertainers' ability to keep tips and set their own schedules was a result of their designation as independent contractors, and that this designation would be imperiled if the entertainers joined Degidio's suit.

The proposed arbitration agreements were quite clear that entertainers would be able to enjoy important remunerative and scheduling benefits only if they worked as independent contractors. For example, Paragraph 7.C of the agreement, which summarized the benefits of being an independent contractor, specified that an entertainer's ability to "choose the days or evenings to appear and perform at the club" was contingent on the entertainer retaining her status as an independent contractor and

13

signing the arbitration agreement.[4] J.A. 78. Paragraph 7.B further emphasized that if the entertainers were found to be employees, then Crazy Horse "would be required to collect, and would retain, all Performance Fees paid by guests to Performer."[5] *Id.*

In their declarations, the entertainers appear to have been operating under the misunderstanding that they would be able to keep their tips and flexible work schedule only if they were independent contractors, and that they would be able to assure themselves of that status only by signing the arbitration agreements. *See* J.A. 85-98. But the benefits that seemingly led the entertainers to sign arbitration agreements are available to both employees and independent contractors alike. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301-02 (1985). The FLSA requires that

---

[4] Paragraph 7.C stated in full: "Performer is a skilled entertainer and the Club is not responsible for providing training or instruction on performances. Since Performer understands that for all purposes under this Agreement, Performer will operate as an independent contractor Performer, Performer retains full independence in exercising judgment as to the time and manner in performing at the Club. For example, Performer shall have the sole and exclusive right to choose the days or evenings to appear and perform at the Club, and individual choice over his/her costumes, props, or any other equipment used during performance. Performer is solely responsible for the development of any performances, number of hours spent performing, and the final control over any aspect of the presentation of any performances." J.A. 79.

[5] Paragraph 7.B stated in full: "The Club and Performer acknowledge and represent that if the relationship between them was that of employer and employee, the Club would be required to collect, and would retain, all Performance Fees paid by guests to Performer. Performer acknowledges and agrees that if the relationship were one of employer/employee, all Performance Fees would be the property of the Club. THE PARTIES ACKNOWLEDGE AND REPRESENT THAT PERFORMER'S RIGHT TO OBTAIN AND KEEP PERFORMANCE FEES PURSUANT TO THIS LICENSE IS SPECIFICALLY CONTINGENT UPON THE BUSINESS RELATIONSHIP OF THE PARTIES BEING THAT OF THE CLUB BEING A LICENSOR AND TEMPORARY SPACE LESSOR AND PERFORMER BEING AN INDEPENDENT PERFORMER LICENSEE AND TEMPORARY SPACE LESSEE." J.A. 79.

14

employers pay a minimum wage and overtime rates to their employees. 29 U.S.C. §§ 206-07. It does not prevent parties—whether they be businesses, employees, or independent contractors—from getting together to settle most questions of wages and scheduling to their mutual satisfaction. *See Roland Elec. Co. v. Walling*, 326 U.S. 657, 668 (1946). In other words, while the parties cannot circumvent the FLSA with a simple contractual declaration, *see Tony & Susan Alamo Found.*, 471 U.S. at 302, they remain free to determine most features of their relationship. Insofar as the entertainers signed the arbitration agreements because they thought that employment status would deprive them of any say-so over the conditions of their employment, the agreements are misleading.

As a final matter, the agreements were all presented to plaintiffs in a furtive manner. When it comes to FLSA collective actions, the mechanism by which parties join an ongoing lawsuit reposes in district courts the responsibility to supervise and manage contacts with potential plaintiffs. To join an FLSA class, each potential plaintiff must consent in writing to become a party in the case. 29 U.S.C. § 216(b). This mechanism has come to be known as the "opt-in" requirement.

The FLSA's opt-in requirement was enacted in response "to excessive litigation spawned by plaintiffs lacking a personal interest in the outcome." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989). The requirement seeks to balance employees' interest in pooling resources to bring collective actions and employers' interest in reducing baseless lawsuits. In order to strike this balance, district courts must be able to supervise contacts between the parties and their respective counsel to ensure that potential plaintiffs are not misled about the consequences of joining a class in an ongoing

15

employment dispute. The district court's supervisory role helps to ensure that "employees receiv[e] accurate and timely notice . . . so that they can make informed decisions about whether to participate." *Hoffmann-La Roche*, 493 U.S. at 170; *see also Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1201-03 (11th Cir. 1985) ("Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time.").

The agreements in this case were all obtained after potential plaintiffs met with Crazy Horse's CFO or counsel. The setting here was ripe for duress: Not only were arbitration agreements executed without knowledge of the court and in the context of an employment relationship in which the employer alone could profess the requisite legal expertise. They falsely suggested that participation in the lawsuit would deprive potential plaintiffs of important professional rights. The combination of these circumstances rendered defendant's conduct indefensible from the get-go. The district court was right to describe the "circumstances here" as "distinct and disturbing," J.A. 911, and it correctly denied enforcement of these sham agreements. We respect the admirable care and patience of that court in the face of obviously trying circumstances.

The judgment of the district court is affirmed and the case remanded for further proceedings consistent with this opinion.

*AFFIRMED AND REMANDED*

16